**RECORD NO. 11-4778**

In The
# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## JESSE AARON DAVISON,

*Defendant – Appellant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT BALTIMORE

_____

## BRIEF OF APPELLANT

_____

Edward C. Sussman
LAW OFFICE OF EDWARD SUSSMAN
601 Pennsylvania Avenue, NW
South Building, Suite 900
Washington, DC 20004
(202) 737-7110

*Counsel for Appellant*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . iii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . 3

    The Motions Hearing . . . . . . . . . . . . . . . . . 5

    The Trial . . . . . . . . . . . . . . . . . . . . . 8

    Count Two . . . . . . . . . . . . . . . . . . . . . 12

    Count Three . . . . . . . . . . . . . . . . . . . . 13

    Count Four . . . . . . . . . . . . . . . . . . . . 13

    Count Five . . . . . . . . . . . . . . . . . . . . 13

    Appellant's Testimony . . . . . . . . . . . . . . . 19

    Closing Argument . . . . . . . . . . . . . . . . . 23

    Sentencing Hearing . . . . . . . . . . . . . . . . 25

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . 26

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 26

    I.    THE DISTRICT COURT ERRED IN DENYING THE DEFENDANT'S
          MOTION TO SUPPRESS THE FRUITS OF THE SEARCH OF A
          TWO GIGABYTE COMPUTER DISK THAT CONTAINED IMAGES OF
          CHILD PORNOGRAPHY WHEN IT CONCLUDED THAT THE SEARCH
          WARRANTS USED TO OBTAIN THOSE IMAGES HAD BEEN
          ISSUED BY A NEUTRAL AND DETACHED JUDICIAL OFFICER . 26

          A.    Standard of Review . . . . . . . . . . . 26

          B.    Discussion . . . . . . . . . . . . . . . 27

II.   THE DISTRICT COURT MISINTERPRETED THE MANDATORY
      LIFE WITHOUT PAROLE PROVISIONS OF 18 U.S.C.
      § 3559(e) WHEN IT CONCLUDED THAT IT WAS REQUIRED TO
      IMPOSE LIFE SENTENCES ON THE APPELLANT FOR HIS
      CONVICTIONS FOR PRODUCTION OF CHILD PORNOGRAPHY AND
      CONSPIRACY TO PRODUCE CHILD PORNOGRAPHY . . . . . .   29

      A.   Standard of Review . . . . . . . . . . . . .   29

      B.   Discussion . . . . . . . . . . . . . . . . .   29

III.  THE EVIDENCE WAS INSUFFICIENT CONCERNING ALL COUNTS
      OF CONVICTION . . . . . . . . . . . . . . . . . . .   32

      A.   Standard of Review . . . . . . . . . . . . .   32

      B.   Discussion . . . . . . . . . . . . . . . . .   32

           Count One - Conspiracy to Produce Child
           Pornography . . . . . . . . . . . . . . . . .   32

           Counts Two & Three . . . . . . . . . . . . .   35

           Counts Four & Five . . . . . . . . . . . . .   37

           Count Seven  . . . . . . . . . . . . . . . .   38

           Count Eight . . . . . . . . . . . . . . . . .   39

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . .   41

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . .   41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

TABLE OF AUTHORITIES

Page(s)

CASES

Burgess v. United States,
     128 S. Ct. 1572 (2008) . . . . . . . . . . . . . . . . . 30

Fowler v. United States,
     131 S. Ct 2045 (2011) . . . . . . . . . . . . . . . 39, 40

Furlong v. United States,
     332 F.3d 753 (4th Cir. 2003) . . . . . . . . . . . . . 32

Kyllo v. United States,
     533 U.S. 27 (2001) . . . . . . . . . . . . . . . . . . 29

Lo-Ji Sales, Inc. v. New York,
     442 U.S. 319 (1979) . . . . . . . . . . . . . . . . . . 28

Mapp v. Ohio,
     367 U.S. 643 (1961) . . . . . . . . . . . . . . . . . . 27

Rakas v. Illinois,
     439 U.S. 128 (1978) . . . . . . . . . . . . . . . . . . 28

United States v. Broxmeyer,
     616 F.3d 120 (2d Cir. 2010) . . . . . . . . . . . . . . 36

United States v. Calandra,
     414 U.S. 338 (1974) . . . . . . . . . . . . . . . . . . 27

United States v. Ciraolo,
     476 U.S. 207 (1986) . . . . . . . . . . . . . . . . . . 29

United States v. Doyle,
     650 F.3d 460 (4th Cir. 2011) . . . . . . . . . . . . . 27

United States v. Ellis,
     121 F.3d 908 (4th Cir. 1997) . . . . . . . . . . . . . 35

United States v. Guijon-Ortiz,
     660 F.3d 757 (4th Cir. 2011) . . . . . . . . . . . . 26-27

United States v. Leon,
     468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . 27

United States v. Lockhart,
     382 F.3d 447 (4th Cir. 2004) . . . . . . . . . . . . . 32

United States v. Malloy,
    568 F.3d 166 (4th Cir. 2009) . . . . . . . . . . . . . . 36

United States v. Perez,
    393 F.3d 457 (4th Cir. 2004) . . . . . . . . . . . . . . 27

United States v. Perkins,
    363 F.3d 317 (4th Cir. 2004) . . . . . . . . . . . . . . 27

United States v. Perry,
    335 F.3d 316 (4th Cir. 2003) . . . . . . . . . . . . . . 40

United States v. Seegers,
    271 F.3d 181 (4th Cir. 2001) . . . . . . . . . . . . . . 29

United States v. Servance,
    394 F.3d 222 (4th Cir. 2005) . . . . . . . . . . . . . . 28

United States v. Stevenson,
    396 F.3d 538 (4th Cir. 2005) . . . . . . . . . . . . . . 29

United States v. Wainwright,
    789 F. Supp. 2d 699 (E.Va. 2011) . . . . . . . . . . . . 40

CONSTITUTIONAL PROVISION

U.S. CONST. amend. IV . . . . . . . . . . . . . . . . . . 27

STATUTES

18 U.S.C. § 1512(a)(1)(C) . . . . . . . . . . . . . . . . 39

18 U.S.C. § 1512(c)(1) . . . . . . . . . . . . . . . . 1, 39

18 U.S.C. § 1512(c)(2) . . . . . . . . . . . . . . . . 1, 39

18 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 2241(c) . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 2251(a) . . . . . . . . . . . . . . . . . . 1, 2

18 U.S.C. § 2251(c)(1) . . . . . . . . . . . . . . . . . 30

18 U.S.C. § 2251(e) . . . . . . . . . . . . . . . . . 2, 30

18 U.S.C. § 2252(a)(5)(B) . . . . . . . . . . . . . . . 1, 2

18 U.S.C. § 2256 . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3559(e) . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3559(e)(1) . . . . . . . . . . . . . . . . . 30

18 U.S.C. § 3559(e)(2)(B)(i) . . . . . . . . . . . . . . 30

18 U.S.C. § 3559(e)(2)(B)(ii) . . . . . . . . . . . . . 30

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . 1

Md. Code Ann. art. 27, § 462 . . . . . . . . . . . . . . 9

OTHER AUTHORITY

PROTECT Act, Pub. L. No. 108-21 . . . . . . . . . . . . . 31

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION

Jesse Davison was charged in an eight count Superseding Indictment with (Count One) Conspiracy to Produce Child Pornography in violation of 18 U.S.C. § 2251(a); (Counts Two through Six) five counts of Production of Child Pornography in violation of 18 U.S.C. § 2251(a), 18 U.S.C. § 2256; (Count Seven) Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(5)(B);and (Count Eight)Tampering with Objects and Proceedings, in violation of 18 U.S.C. §§ 1512(c)(1) and (2). (JA 46) The district court had jurisdiction under 18 U.S.C. § 3231.

The appellant waived his right to a jury trial and began trial before the court on April 20, 2011. On May 12, 2011, Davison was found guilty of violating Counts One through Five, Count Seven and Count Eight.

On July 28, 2011, the appellant, pursuant to the provisions of 18 U.S.C. § 3559(e) was sentenced to concurrent life sentences on Counts One, Two, Three, Four, Five, and Seven by the Honorable Marvin J. Garbis, United States District Judge. He received a concurrent ten year sentence on Count Seven, and a five year concurrent sentence on Count Eight. (JA 1251) The appellant filed a notice of appeal on July 28, 2011. (JA 1249)

This court has jurisdiction pursuant to 28 U.S.C. § 1291.

<u>STATEMENT OF THE ISSUES</u>

I.    WHETHER THE DISTRICT COURT ERRED WHEN IT DENIED THE
APPELLANT'S REQUEST TO SUPPRESS EVIDENCE THAT HAD BEEN
OBTAINED BY A WARRANT THAT WAS SIGNIFICANTLY AUTHORED BY THE
STATE JUDGE WHO AUTHORIZED IT.

II.   WHETHER THE DISTRICT COURT ERRED WHEN CONCLUDED THAT WAS
REQUIRED TO IMPOSE A MANDATORY LIFE SENTENCE UNDER 18 U.S.C.
§ 3559(e) ON APPELLANT'S CONVICTIONS FOR PRODUCTION OF CHILD
PORNOGRAPHY.

III.  WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE APPELLANT'S
CONVICTIONS ON ALL INDICTED COUNTS.

<u>STATEMENT OF THE CASE</u>

On October 13, 2010, the appellant was charged by indictment,
along with co-defendant Tiffany Bolner, with a Conspiracy to
Produce Child Pornography in violation of 18 U.S.C. § 2251(e); two
counts of Production of Child Pornography in violation of 18 U.S.C.
§ 2251(a); and Possession of Child Pornography in violation of 18
U.S.C. § 2252(a)(5)(B). (JA 12)

On February 14, 2011, a Superseding Indictment was issued
charging, Conspiracy to Produce Child Pornography, five counts of
Production of Child Pornography, Possession of Child Pornography,
and Tampering with Objects and Proceedings.

The appellant waived his right to a jury trial and proceeded
to trial before the court. On April 20, 2011 a bench trial was
begun. On May 18, 2011, the court issued an order finding the
appellant guilty of all but one of the indicted counts (Count Six).

On July 28, 2011, the appellant was sentenced, pursuant to the
provisions of 18 U.S.C. § 3559(e) to serve concurrent life
sentences on all counts regarding the production of child

2

pornography. He received a 60 month concurrent sentence on the charge of Tampering with Objects and Proceedings.

On July 28, 2011, the appellant filed a timely notice of appeal. This appeal follows.

<u>STATEMENT OF THE FACTS</u>

On May 20, 2010, Davison was arrested for assaulting his girlfriend (and co-defendant), Tiffany Bolner. Davison and Bolner had befriended an eleven year old girl (hereinafter known as "C.W.") and had spent substantial time with C.W. at various apartments that they shared. Following, Davison's arrest, C.W.'s mother, concerned about Davison's alleged violence against Bolner, asked C.W. if Davison had ever assaulted her. C.W. informed her mother that both Davison and Bolner had toucher her in sexually inappropriate ways. The police were contacted and Tiffany Bolner was interviewed by the authorities. While she denied any wrongdoing in her initial statement, upon a second interview, she confessed to involvement in child molestation. That statement implicated the appellant in the inappropriate activities. Significantly, neither Tiffany Bolner nor C.W. made any mention of any photographs or videos of the misconduct being produced. Both Bolner and Davison were prosecuted in the Circuit Court for Baltimore County.[1]

---

[1]Davison was already in state custody on the charge that he had assaulted Tiffany Bolner.

3

While incarcerated and awaiting trial on the state charges, Davison communicated by mail and telephone with his sister, Laura Davison. In those communications, he expressed concern that his Blackberry telephone and an MP3[2] player contained damaging photographic and video images regarding the molestation of C.W. He urged his sister to obtain the devices and destroy the images. Davison's sister instead told the police about the nature of the appellant's communications.

As a result of the information provided by Ms. Davison, the police obtained three separate search warrants; (a) a warrant to search the apartment occupied by Davison and Bolner at the time of their arrest; (b) the home of Neva Bolner, Tiffany Bolner's mother; and (c) the home of Tiffany Bolner's sister. At the home of Neva Bolner, the police located the Blackberry phone and the MP3 player. Inside the MP3 player was a two gigabyte (2 GB) memory card which depicted images that were the subject of a number of the counts in the superseding indictment.

Several months later, an FBI agent made a number of visits to the apartment that Davison had shared with Bolner. The apartment was vacant and was "for rent." On the second visit, the agent discovered a 64 megabyte "ScanDisk" which contained additional prohibited images that were used as evidence in the prosecutions.

---

[2]An MP3 player is a device which allows music and photographic images to be stored and played.

Prior to trial, co-defendant Bolner entered a plea agreement with the government whereby she agreed to cooperate and testify against the appellant.

### The Motions Hearing

On March 4, 2011, a motions hearing was held on appellant's motions to suppress evidence found on the two gigabyte (2 GB) disk seized from the MP3 player. At the hearing, testimony was adduced that on April 1, 2010, Tiffany Bolner rented an apartment at 3715 8th Street in Baltimore. On May 25, 2010, the landlord provided Ms. Bolner a 60 day notice to vacate and began proceedings to secure her eviction. On August 10, 2010, the landlord regained possession of the property.

Sometime in June 2010, Ms. Neva Bolner, the mother of Tiffany Bolner, presented written permission from her daughter to enter the apartment and retrieve certain belongings. She was permitted to do so by the landlord who was not present when Neva Bolner entered the apartment. (JA 109)

George Jones, a Baltimore police detective, testified that on May 23, 2010, he was asked to interview C.W., a potential victim of sexual abuse. C.W. who was an eleven year old female, reported to him that she spent the night over at the 8th Street apartment shared by Tiffany Bolner and Jesse Davison. C.W. indicated that the appellant rubbed her vaginal area and that Tiffany Bolner performed oral sex on her. In a subsequent interview of Tiffany Bolner by the detective, C.W.'s allegations were corroborated. Ms. Bolner

5

was immediately taken into custody. State charges against the appellant were later initiated.

On June 17, 2010, Jones learned that fellow officers had been contacted by Laura Garland, the sister of the appellant. Ms. Garland reported that she had received phone calls from the appellant requesting that she go to 3715 8th Street, retrieve a Blackberry telephone and a red MP3 player and destroy the two gigabyte and 64 megabyte micro SD cards inside.[3] Additionally, Ms. Garland showed the police a letter written to her by Davison that made a similar request. Later that same day, the officer learned that Tiffany Bolner's mother and sister were at the 8th Street apartment on the night before and removed property from the premises.

As a result of the information received, the officers decided to obtain search warrants for 8th Street apartment rented by Tiffany Bolner, and the homes of Ms. Bolner's mother and sister.

During the course of preparing the warrants, Detective Jones consulted with the States attorney who was assigned to the case. (JA 131) Because of concern for Laura Garland's safety, the affiants for the search warrants[4] did not wish to include her name in the affidavits. Detective Jones testified that he had no

---

[3]Micro SD cards are small computer compatible disks capable of storing audio and visual data.

[4]Detective Jones was not the affiant for all the warrants. Since all the warrants were prepared in the same manner, the identity of the actual affiant is, for purposes of this appeal, deemed irrelevant.

experience regarding how to draft an affidavit in a manner that preserved the anonymity of his source of information.  For that reason, he asked the duty judge, the judicial officer tasked with reviewing the affidavit and issuing the search warrant, how it should be done. (JA 133)  The terminology used in the affidavit, "name not given for safety reasons," was suggested by the reviewing judicial officer.  Detective Jones had spoken to the officer, described the situation in full, and used the exact language suggested by the judge.  (JA 135)  Jones indicated that the conversation with the judge lasted about ten minutes and included a "give and take" where the judge asked questions about the investigation.  (JA 156)

On June 17, 2010, search warrants were executed for the three previously named properties.  The Blackberry telephone and the MP3 player were recovered from 3802 8th Street, the residence of Neva Bolner (Tiffany Bolner's mother).

Approximately four weeks after the seizure of the Blackberry phone and the MP3 player, the detective applied for an additional warrant. This warrant, which was identical in all respects to the first series of warrants, requested authorization to search the 2 GB disk found inside the MP3 player and the memory of the cell phone.  (JA 138)

On cross-examination, the detective testified that five days after the June 17th seizure, he requested a forensic examination of the contents of the seized devices and turned them over to forensic

unit.  He indicated that Maryland state search warrants must be executed within fifteen (15) days of issuance.  (JA 161)  A second warrant request was made on July 15, 2010 and approved on that same day.  No search of the 2 GB was initiated until July 29, 2010, approximately 43 days after the item was seized.  (JA 166)

FBI Agent Rachel Corn testified regarding her location of the 64 megabyte disk on October 1, 2010 inside the apartment formerly shared by the appellant and Tiffany Bolner.  (JA 198)  She indicated that her entry into the apartment was with the consent of the landlord.  Amidst general trash on the living room carpet, the agent found and seized a 64 MB computer disk.  The disk was eventually examined by police forensic experts and pornographic images were found.  Those images became the basis for Counts Three, Five, and Seven of the superseding indictment.

At the close of the hearing, the appellant advanced a variety of arguments concerning why the images recovered from the two seized computer disks should be suppressed.  Those arguments were rejected by the district court in a memorandum opinion and order that was issued on March 16, 2011.  (JA 256)  Principally, the district court concluded that the appellant had no reasonable expectation of privacy in either of the computer disks and, thus, lacked standing to contest their search.

<u>The Trial</u>

On April 20, 2011, a bench trial was begun.  Much of the evidence concerning the recovery of the two computer disks was

identical to that adduced during the suppression hearing and will not be repeated here.  To the extent that it is necessary to describe the contents of the various videos and images that formed the basis of the indicted counts, that description shall be confined to the facts that are vital to the arguments for reversal to me made in this brief.[5]

Prior to the first witness being called, the appellant, by stipulation, agreed that in 2000 he had been convicted under Article 27, Section 462 of the Maryland Annotated Code of the attempted rape of a victim who had not attained the age of seventeen (17) at the time of offense.  (JA 310)

The government began its case by eliciting the testimony of the Baltimore police officers who had investigated the initial allegations of sexual abuse by C.W.  Detective George Jones testified regarding the initial report by C.W. and his subsequent interview of Tiffany Bolner on May 24, 2010.  Jones testified that Bolner initially denied any wrongdoing.  (JA 315)  Following C.W.'s May 26, 2010 interview by a social worker, Jones spoke to Bolner once more.  In a videotaped interview, Ms. Bolner confessed to her participation in sexual misconduct involving C.W.  As a result of her statement, Ms. Bolner was immediately arrested. Within a matter of days, the appellant - who was already in custody - was charged in connection with the sexual molestation of C.W.

---

[5]Obviously, the images themselves are "contraband," and are not in the possession of counsel for the appellant and cannot be furnished by him as part of the record.

Detective Jones repeated the testimony he had given concerning his contact with Laura Garland and the information that she had provided to him. Included was the appellant's June 7, 2010 letter to her in which he requested that she dispose of a 64 MB computer disk, and delete various images from a 2 GB disk. (JA 324) The detective then described obtaining search warrants for the three previously mentioned residences, and his June 17, 2010 recovery of the MP3 player and Blackberry cell phone at the residence of Neva Bolner. Jones additionally testified that, following the search, he received a second letter from Laura Garland. The letter, dated June 18, 2010, was from the appellant.

On cross-examination, Jones stated that until his conversation with Laura Garland, and despite his previous interviews with Tiffany Bolner[6] and C.W., he had no idea that there was any photographic evidence regarding the matter.

Neva Bolner, the mother of Tiffany, described how her daughter and C.W. became friends. In February 2010, Neva Bolner rented a room in 3802 8th Street. That spring, Tiffany and the appellant moved into the top floor apartment in 3715 8th Street. Following her daughter's arrest, Ms. Bolner testified that she entered her daughter's apartment on three occasions. The third time, she removed Tiffany Bolner's possessions, including a red MP3 player. She had previously obtained a Blackberry phone from a purse possessed by Tiffany Bolner at the time of her arrest. (JA 364)

---

[6]The detective testified that the second interview of Tiffany Bolner lasted almost three hours. (JA 341)

Ms. Bolner who put the phone in her night stand, had previously seen the phone used by Tiffany and the appellant.  The MP3 player, when recovered, was also placed in the night stand.

Neva Bolner testified to her dislike of the appellant.  She indicated that following her daughter's arrest, she had received a number of letters from Tiffany Bolner; in numerous letters Tiffany Bolner denied the allegations regarding sexual molestation of C.W. When finally she received a letter in which Tiffany admitted to her involvement, Neva Bolner destroyed the letter.  The latter matter was the subject of a later stipulation.  (JA 791)  Ms. Bolner admitted that the only item taken from her daughter's apartment which she maintained was the MP3 player.  She denied that Tiffany had specifically requested that she take possession of that item.

Kevin Allen, a Baltimore police forensic examiner, testified regarding his examination of the MP3 player, the computer disk found inside, and the Blackberry cell phone.  Using specially designed software, the officer was able to review and copy various photographic images on the 2 GB SD card.  He found nothing of evidentiary significance on the internal memory of the Blackberry. While the witness testified that the images on the 2GB computer disk were created by a Blackberry phone, he could not testify that they were created by the exact phone that he examined.  (JA 419)

Daniel Montalvo, a second Baltimore police forensic investigator, testified that he was asked by FBI Agent Rachel Corn to examine the 64 MB memory card. Using different software than had

11

previously been employed, Montalvo was able to recover data that had been previously deleted from the disk. (JA 431) That data included five audio/video files and 35 photographs. (JA 450) The recovered data became the basis for production of child pornography charges in Counts Two, Four, and Six of the Superseding Indictment. Montalvo indicated that he was never asked to examine the 2 GB card, but did testify to the process by which images created on one card could be copied to the other. His testimony was later clarified by the government which indicated that, based on its review, there were no duplicate images on the two cards. (JA 802)

The images that formed the basis of the various indicted counts was admitted through the testimony of FBI Agent Rachel Corn. In general, the images can be described in the following manner:

<u>Count Two</u>

The second count of the superseding indictment (Production of Child Pornography) was based on a nine minute video found on the 2 GB SD card. The video bore the computer imposed date of February 7, 2010. The video depicts the appellant masturbating Tiffany Bolner and performing oral sex upon Ms. Bolner. C.W., who is the "photographer" throughout the entire video is shown touching one of Bolner's breasts on top of her clothing. C.W. is additionally shown to be touching Bolner's vaginal area at the same time as Davison. (JA 514)

### Count Three

Count Three is a four minute video found on the 64 MB SD card and bears the date February 11, 2010. This video was also taken by C.W. and depicts Davison and C.W. simultaneously touching Bolner's vaginal area. (JA 519)

### Count Four

Count Four involves a thirteen (13) second video found on the 2 GB SD card and dated March 12, 2010 (10:34 p.m.) The video, taken from a position near Davison's upper body, depicts a nude C.W. masturbating the appellant. No camera or other device is depicted in the video. (JA 533)

### Count Five

Count Five, also created on March 12, 2010 (10:37 p.m.) depicts C.W. performing oral sex on the appellant. This video is also taken from the position of the appellant's upper torso. No camera is depicted in the video. (JA 535)

Kimberly Tusing, the mother of C.W. described how in the summer of 2009, her daughter became friends with Tiffany Bolner. Tusing testified that C.W. frequently "spent nights" at Bolner's house. (JA 584) At some point, C.W. told Ms. Tusing that Tiffany had a boyfriend named Jesse, and that Jesse had a ten year old daughter named Megan. (JA 586) Ms. Tusing allowed C.W. to visit Bolner and Davison. The witness reported that C.W. would return from visits and describe the activities that she and "Megan" had enjoyed. Eventually, Tusing allowed C.W. to spend nights with

Bolner and Davison. Tusing described how Bolner had called her and reported that she (Bolner) was having difficulty controlling Davison's daughter. (JA 588)

Tusing testified that in the spring of 2010, Bolner and Davison moved in to an apartment at 3715 8th Street. The apartment was across the street from the residence of Tusing's mother. Tusing had not met Davison before he and Bolner moved to 8th Street. She indicated that Davison told her that his daughter did not visit because "his baby's mother" did not like her visiting the city. He also confided that had a criminal conviction for assault.

After Davison's arrest for assaulting Bolner, Tusing learned from C.W. that she had been inappropriately touched by the appellant. When she confronted Bolner about the matter, Bolner denied any knowledge of such conduct. (JA 603)

Tracy Hollins, who resided next door to Davison and Bolner on 8th Street, testified that her daughter also spent time at the appellant's apartment. She considered Bolner to be her "best friend" and showed her how to download videos and other images to the computer. (JA 609)

Co-defendant Tiffany Bolner, pursuant to a plea agreement, testified against Davison.[7] She described how she met the appellant through the internet at the beginning of 2010. When she first met Davison in person, she brought C.W. with her. (JA 621) Shortly thereafter, the relationship between Bolner and Davison

---

[7]By prior agreement, the appellant requested, and was granted, the right to personally cross-examine Bolner.

became a romantic one. Bolner testified that she told C.W.'s grandmother that Davison had children in order to facilitate C.W.'s visits to their apartment.

C.W. first stayed overnight with Bolner and Davison during the latter part of January 2010. It was on C.W.'s second overnight visit that Bolner and Davison had sexual intercourse in front of her. Bolner proceeded to describe how the sexual conduct involving the three began to escalate. Bolner described, in general, the sexual conduct that occurred among the three.

Turning to the prohibited images, Bolner denied taking any of the pictures or videos. (JA 647) She testified that Davison always used his Blackberry and maintained the images on two SD cards; a 64 MB card and a 2 GB card. (JA 666) Bolner admitted to initially lying to the police regarding sexual involvement with C.W. After her initial interview with the police, she deleted images from the 64 MB card that she found in the Blackberry. (JA 667) Bolner identified the red MP3 player as belonging to Davison, but denied any knowledge of the 2 GB card inside or the card's contents. (JA 669)

On cross-examination by the appellant focused on the numerous misrepresentations that Bolner had made about ownership of a car, her employment, and the death of her infant child. (JA 687) Bolner additionally conceded that she had lied to the police in her first interview concerning sexual activities with C.W. In a second interview, she withheld information regarding photographs and

videos of the activity, and her destruction of those images.  (JA 701)

Questioned about the video that formed the basis of Count Two, Bolner admitted that while C.W. had been drinking prior to the filming of the video, nobody had encouraged her to do so.  (JA 721) Prior to the sexual activity depicted in the video, Bolner indicated that there had been no discussion of what was to take place or whether it would be photographed.  (JA 722)  It was not until the video was in progress that Bolner realized that the activity was being taped. She further indicated that she was upset by C.W.'s involvement in the sexual activity.

With respect to the video in Count Three, Bolner similarly testified that she was wholly unaware that any sexual activity was to be recorded.  Further, neither she nor Davison told C.W. to record the conduct.  (JA 725)  According to the witness, C.W. would frequently pick up the Blackberry and photographed whatever pleased her.  C.W. was totally familiar with the photographic and video functions of the cell phone.

Turning to Count Four, Bolner testified that the video (recovered from the 2 GB SD card) was filmed by either C.W. or herself.  (JA 728)  Later on, she indicated that it could have been either C.W., Davison, or herself that took the video.  (JA 729)  On further cross-examination, Bolner conceded that the video could well have depicted both of Davison's hands, neither holding a camera.

The photograph in Count Five, taken only a minute or so after that in Count Four, was recovered from the 64 MB card. (JA 730) Bolner denied transferring the images from one card to the other. Despite the testimony of Tracy Hollins that she had shown Bolner how to transfer images, (JA 609), Bolner denied that Hollings had taught her how to do so. (JA 730) She did admit to knowing the technique.

With respect to Count Four (a 13 second video of C.W. masturbating the appellant), Bolner initially denied being present in the room when that act occurred. She further denied that her voice was overheard on the tape. Davison impeached Bolner with her previous statement to law enforcement that she recalled taking the video of C.W. masturbating the appellant. (JA 738) Bolner was certain that the Blackberry was never handed back and forth while sexual activity was being photographed. She was consistent in her testimony that the subject of photographing sexual activity involving C.W. was never discussed by the appellant and herself. (JA 739)

The witness agreed that following the appellant's May 20, 2010 arrest, she had no contact with him before she was arrested on May 26, 2010. It was she alone who decided to delete the images on the 64 MB card. Although she maintained that she had no knowledge of the 2 GB card or its contents, she admitted to having both the Blackberry and the MP3 player in her purse at the time of her arrest. (JA 754) Those items were released by the police to

17

Bolner's sister following her arrest. Additionally, Bolner testified that she and Davison spoke for several minutes in the cellblock following her arrest on May 26, 2010. (JA 756)

Laura Garland, the appellant's sister, testified about the letters and phone calls she received from the appellant after his arrest. She indicated that she found Tiffany Bolner to be a liar and for that reason, and others, did not like her. (JA 833) Garland testified that prior to Bolner's arrest, Bolner had called her and totally denied any wrongdoing. (JA 834)

C.W. was the last government witness. She described her friendship with Tiffany Bolner and meeting the appellant. C.W. testified that she told her family that Davison had a ten year old daughter, a matter she had discussed only with Bolner. (JA 856) While C.W. believed that Davison knew she was telling others about a non-existent daughter, she had no information that Davison himself told this to anybody.

C.W. described her use of alcohol and the inappropriate sexual behavior that ensued. (JA 860) She testified in some detail concerning her sexual molestation by Bolner and the appellant. Despite videos introduced in evidence that depicted C.W. using a Blackberry to take videos (Counts Two and Three), she denied ever taking any videos. (JA 872)

18

C.W. was shown a number of the exhibits, including those that formed the basis of Counts Four and Five. While Tiffany Bolner denied being present when those images were created, C.W. identified Bolner's voice on the tape. (JA 878)

On cross-examination, C.W. did not recall discussion about photographing what was occurring. The Blackberry was always present and sometimes it would be used, and sometimes not. (JA 890). At times, C.W. simply picked the cell phone up on her own. Although the evidence clearly depicted C.W. using the Blackberry to videotape the activities that formed the basis of Counts Two and Three, C.W. denied that she ever photographed inappropriate behavior. (JA 891)

Following C.W.'s testimony, the government rested. The appellant moved for a judgment of acquittal on all counts. That motion was denied without prejudice by the district court. (JA 905)

<u>Appellant's Testimony</u>

Jesse Davison took the witness stand in his own behalf. He testified that, at the age of sixteen, he was convicted of attempted rape in Maryland. In January, 2010, he met Tiffany Bolner through "MySpace," an internet website. They met in person shortly thereafter and began a romantic relationship. At their first meeting, Bolner was accompanied by C.W. who she described as her sister. It was two months before Davison learned that C.W. and Bolner were not really sisters.

Davison testified how he, Bolner and C.W. were "snowed in" at his residence by blizzard that blanketed the Baltimore area on February 5, 2010. It was during that period that he first had sexual contact with C.W. (JA 920)

Davison testified that with respect to the videos that formed the basis of Counts Two and Three, he personally made no effort whatsoever to produce images of the behavior depicted. Similarly, he testified that with respect to those videos, that Bolner made no effort either. The appellant stated that C.W. was familiar with the use of the Blackberry, including the video feature. With the exception of traditional calling,[8] C.W. was free to use the Blackberry as she pleased. (JA 923)

With respect to February 7, 2010 (Count Two), Davison testified that, since the Blackberry gave no indication that videotaping was ongoing, he had no idea that C.W. was actually recording the sexual activity, until C.W. mentioned it. Prior to the recording, he testified that C.W. was using the cell phone to listen to music and play games. (JA 924) According to Davison, neither he nor Bolner asked C.W. to record anything.

With respect to the February 11th event (Count Three), Davison recalled that the cell phone was on the night stand when sexual activity began.[9] He testified that sexual activity had been

---

[8]Davison had only limited minutes of cell phone usage and was protective of having his minutes "burned."

[9]The testimony was consistent throughout the trial that the phone was available to anyone.

ongoing for five or ten minutes before the video began and that neither he nor Bolner asked C.W. to photograph the events or encouraged her to continue. (JA 925)

Turning to Count Four, a short video depicting the appellant being masturbated by C.W., Davison said that - as the event occurred - he has no knowledge that a video was being made. He concluded that the video was made by Bolner who was lying across his chest. Specifically, Bolner "angled her body to where her upper portion was between [the appellant] and the activity going on. I couldn't see over or around her." (JA 928) Consistent with the testimony of C.W., Davison stated that Bolner's voice could be heard on the video. The appellant stressed that he never requested that Bolner take a video of the activity.

Similarly, the still photograph that formed the basis of Count Five, C.W. performing oral sex on the appellant, was produced in the same manner. The photograph was produced approximately three minutes after the video in Count Four. Davison testified that, similar to that video the photograph was produced by Bolner without his knowledge. (JA 933) He stated he had no knowledge that the image existed[10] until he was told about it by Bolner in their May 27th (2010) conversation at the jail. Again, Davison stressed that

---

[10]The image was recovered from the 64 MB SD card.

there was no discussion between he and Bolner regarding taking the photograph.[11]

Davison admitted to knowledge of the existence of the 2 GB disk, but knew nothing of the 64 MB disk until informed about it by Bolner during their May 27th jail conversation. (JA 943) He testified that he had placed personal pictures on the 2 GB disk, but no pornographic images. When Bolner had asked him for a memory card to place images upon, Davison had given her the 2 GB disk to use. He had not looked at the 2 GB card after he gave it to Bolner. It was only after their conversation in the jail, that Davison recognized that their was damaging evidence on both cards and made efforts to have that evidence destroyed. The appellant's efforts were directed solely toward impeding his prosecution in the pending state sexual molestation case. He testified that he had not given any though whatsoever to a federal prosecution when he contacted his sister. (JA 953)

On cross-examination, the government attacked the appellant's credibility and his testimony that - prior to the jail conversation with Bolner - he had no knowledge of the 64 MB card's existence or contents. In the letters between the appellant and Bolner, written prior to the initiation of the federal prosecution, Davison testified that he was only concerned with how the conduct depicted on the computer cards affected the state prosecution. Who produced

---

[11]Additional testimony from Davison dealt with Count Six of the Superseding Indictment. Since the appellant was eventually acquitted on that count, the testimony regarding the matter is not relevant to this brief.

them, what card they were on, or how they were produced, was meaningless to him at that time.

When questioned regarding his statement to C.W.'s mother that he had a ten year old daughter, Davison stated that he merely agreed with what Bolner and C.W. has already said.  (JA 979)

Despite the court's consistent position that the images "spoke for themselves," the government cross-examined the appellant extensively about what appeared on the various videos.  The prosecution continually implied that Davison either knew the videos were being created or made them himself.  Much of the questioning simply spawned argument between prosecutor and defendant.

At the close of the appellant's cross examination, the defense rested.  Davison's motion for dismissal of all counts based on the insufficiency of the evidence were denied. (JA 1017).

<u>Closing Argument</u>

The parties convened on May 6, 2011 for closing argument. Prior to the argument, Davison - through counsel - produced a letter written by Tiffany Bolner to Davison and dated April 28, 2011.  The letter was an apparent response to one the appellant had written to Bolner following her trial testimony.  (JA 1244)  The letter, if genuine, raised significant issues concerning the credibility of Bolner as a witness.  It had been provided to defense counsel only one-half hour before the scheduled hearing. In the letter, Bolner stated that she had been lying for a

23

significant period of time and was fearful that, if she changed her story, that her plea agreement would be invalidated.

Despite uncertainty concerning the significance of the letter, and noting that the letter might require argument to be reopened, the court decided to proceed with closing argument. At the end of closing argument, the court took the matter under advisement. It was decided that Bolner's attorney should confer with her and then the court could decide the direction in which to proceed. (JA 1133)

On May 12, 2011, the court was scheduled to give its verdict in open court. The government represented that it had spoken to Tiffany Bolner and that she was prepared to admit that she had written the letter that had been presented at the May 6, 2011 hearing. The defendant was permitted to re-open his case and question Bolner. Bolner admitted that she wrote the letter dated April 28, 2011. The letter was written following her trial testimony in response to a letter that Davison had written to her. (JA 1141)

Bolner admitted that she had written the letter and had falsely claimed that it had been forged. In the letter she had stated that she had not been totally truthful during her trial testimony. On the stand, Bolner explained that her testimony had been affected by her fear of losing her plea bargain. She had adhered to the story that the letter had been forged until that very morning. (JA 1146)

24

Despite admitting to a host of falsifications, Bolner maintained that her trial testimony had been true. (JA 1164)

Following that additional testimony, the court permitted defense counsel to make a supplemental statement based on the additional evidence and testimony. (JA 1176) In brief, counsel argued that any finding in the case that relied on Bolner's testimony was inherently suspect. This included how the various images were produced, who produced them, the positions of the parties at the time the images were produced, and Bolner's knowledge regarding the 2 GB card.

The government, in response, argued that Bolner's testimony was not necessary to prove its case against Davison and that the pictures told the full story.

Following argument, the court rendered its verdict. Making factual findings that supported the verdict, (JA 1192) the court convicted Davison of all counts (other than Count Six) of the Superseding Indictment.

### Sentencing Hearing

At sentencing, the primary issue was the applicability of the mandatory life provision of 18 U.S.C. § 3559(e) to Counts One through Five of the Superseding Indictment. That provision required a mandatory sentence of life without parole for production of child pornography when a defendant has a prior sex offense conviction in which a minor was the victim. Davison argued that since he was himself under the age of seventeen at the time he

incurred the prior conviction, the mandatory life provision did not apply to him.

The court rejected his argument and sentenced him to life without parole on the charges of conspiracy to produce child pornography, and four counts of production of child pornography.

A timely notice of appeal was filed and this appeal follows.

## SUMMARY OF ARGUMENT

In this appeal the appellant contends that the district court erred when it failed to suppress the introduction into evidence of pornographic images found on a 2 GB computer disk that was obtained through a warrant authorized by a state judge who was neither neutral or detached and participated in the drafting of the supporting affidavit.  The appellant further maintains that evidence was insufficient to sustain conviction on all counts.  As a final matter, it is argued that the provisions of 18 U.S.C. § 3559(e), under which the sentencing court imposed a mandatory life sentence, did not apply to appellant's convictions.

## ARGUMENT

I.    THE DISTRICT COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO
      SUPPRESS THE FRUITS OF THE SEARCH OF A TWO GIGABYTE COMPUTER
      DISK THAT CONTAINED IMAGES OF CHILD PORNOGRAPHY WHEN IT
      CONCLUDED THAT THE SEARCH WARRANTS USED TO OBTAIN THOSE IMAGES
      HAD BEEN ISSUED BY A NEUTRAL AND DETACHED JUDICIAL OFFICER.

### A.    Standard of Review

The district court's legal conclusions underlying a suppression determination are reviewed *de novo* while its factual findings are reviewed for clear error. United States v. Guijon-Ortiz, 660 F.3d

26

757 (4ᵗʰ Cir. 2011).  Because the district court denied the motion to suppress, the evidence is construed on appeal in the light most favorable to the government.  United States v. Perkins, 363 F.3d 317 (4ᵗʰ Cir. 2004).

### B.  Discussion

It is axiomatic that the Fourth Amendment to the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."  Generally, when a search violates the Fourth Amendment the fruits thereof are inadmissible under the exclusionary rule.  See United States v. Calandra, 414 U.S. 338 (1974); Mapp v. Ohio, 367 U.S. 643 (1961).  An exception to the exclusionary rule arises when a police officer acts with objective good faith in executing the warrant unless "a reasonably well trained officer" would not have relied on the warrant.  See United States v. Leon, 468 U.S. 897 (1984); United States v. Doyle, 650 F.3d 460 (4ᵗʰ Cir. 2011).  Clearly, discretion rests with the appellate court to decide the question of good faith. See United States v. Perez, 393 F.3d 457 (4ᵗʰ Cir. 2004).

The facts leading up to the issuance of the various warrants are not in question.  Baltimore police were pursuing an investigation into allegations of child molestation on the appellant's part when they were contacted by Laura Garland.  Ms. Garland reported telephone and mail contacts by the appellant in which he requested her to destroy images on computer memory cards.

Investigating officers applied for various search warrants in an effort to locate the memory cards. The 2 GB card was located in the home of Neva Bolner. Ms. Bolner was the mother of Davison's co-defendant. Sometime later, a second warrant was obtained to conduct a forensic computer search of the memory card. The second warrant embodied all of the information contained in the first.

In applying for the first set of warrants, police officers telephoned and then went to the home of a state court judge. In the "give and take" between the officers and the judge,[12] concern was raised about identifying the informant (Laura Garland) in the affidavit. Apparently, the state judge explained to the officers how to draft the affidavit in a manner that would conceal the source's identity. The suggested language was placed in the affidavit.

The appellant submits that the intrusion of the state judge in the application process compromises any government claim of good faith. Moreover, it clearly establishes that the "issuing magistrate wholly abandoned [her] judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319 (1979); United States v. Servance, 394 F.3d 222 (4th Cir. 2005).

At the outset, it is submitted that the appellant maintained a legitimate expectation of privacy in the 2 GB memory card. See Rakas v. Illinois, 439 U.S. 128 (1978). While his arrest had removed the card from his control, that was hardly an abandonment.

_____

[12]The conversation was described by a detective as lasting approximately ten minutes.

It had been left in the apartment that he occupied and had only been removed when the property was vacated. Clearly, his privacy interest in the information that he placed on the disk was consistent with "a subjective expectations of privacy that society recognizes as reasonable." See Kyllo v. United States, 533 U.S. 27 (2001); United States v. Ciraolo, 476 U.S. 207 (1986); United States v. Stevenson, 396 F.3d 538 (4th Cir. 2005).

The record makes it clear that the state judge became an "adjunct law enforcement officer" and involved herself in the creation of the underlying affidavit. In an affidavit that gave precious little information concerning the credibility of the informant, the judge relied on information that was not included in the affidavit. For these reasons, the seizure of the 2 GB disk, and all fruits from that seizure must be suppressed.

II. THE DISTRICT COURT MISINTERPRETED THE MANDATORY LIFE WITHOUT PAROLE PROVISIONS OF 18 U.S.C. § 3559(e) WHEN IT CONCLUDED THAT IT WAS REQUIRED TO IMPOSE LIFE SENTENCES ON THE APPELLANT FOR HIS CONVICTIONS FOR PRODUCTION OF CHILD PORNOGRAPHY AND CONSPIRACY TO PRODUCE CHILD PORNOGRAPHY.

**A.   Standard of Review**

Questions of pure statutory interpretation by the district court are reviewed de novo. United States v. Seegers, 271 F.3d 181 (4th Cir. 2001).

**B.   Discussion**

The principal issue at sentencing was the applicability of the mandatory life without parole provision of 18 U.S.C. § 3559(e) to appellant's convictions. At sentencing Davison conceded that the

enhancement provision of 18 U.S.C. § 2251(e) applied to his sentencing, § 3559(e) did not.[13] It was clear from the record that Davison had previously incurred a Maryland state conviction for Attempted Rape. It was conceded that the victim of the offense was 15 years of age; the appellant was 16.

18 U.S.C. §3559(e)(1) states:

(1) In General - A person who is convicted of a Federal Sex offense in which a minor is the victim shall be sentenced to life imprisonment if the person has a prior sex conviction in which a minor was the victim, unless the sentence of death is imposed.

It was uncontested that the state felony conviction involved an incident occurring a private residence. It is clear that there was no basis for federal jurisdiction regarding that offense. The appellant contends that to qualify for the mandatory life sentence, the prior sex conviction does not meet the statutory definition of "State sex offense" under either 18 U.S.C. §§ 3559(e)(2)(B)(i) or (B)(ii).

There is absolutely nothing to indicate that the state conviction involved interstate or foreign commerce or the use of the mails. Nor did it occur at a place that could be considered federal territory. Further, the age of the victim was not an element of the state offense. Consequently, the statute is inherently ambiguous and the rule of lenity prohibits the imposition of the mandatory life term. Burgess v. United States, 128 S. Ct. 1572 (2008).

---

[13]Section 2251(e) provides a sentence of 25 to 50 years for recidivists convicted of violating 18 U.S.C. § 2251(c)(1).

Additionally, the appellant contends that analysis of the legislative history concerning § 3559(e) indicates that Congress did not intend the mandatory life sentence to apply to his case. Subsection (e) of the statute was added by the 2003 amendments embodied in the PROTECT Act, Pub. L. No. 108-21. Legislative history concerning the subsection (e) is, to say the least, sparse. The 2002 House Report speaks about "protect[ing] America's children by permanently removing the worst offenders from our society- those who repeatedly victimize children." Left unclear is whether the statute is intended to reach those individuals *who while minors themselves previously victimized minors.*

Significantly, 18 U.S.C. § 2241, the federal Aggravated Sexual Abuse Statute, provides the federal analog to the appellant's state offense. That statute proscribes the use of force in an attempt to have a person engage in a sexual act. Most notable, however, is subsection (c) of the statute which deals with offenses against children. While the subsection provides an enhanced penalty for sexual abuse against victims under the age of 12, it does not provide an enhanced penalty for crimes against 12 to 16 year olds, *where the perpetrator is less than four years older than the victim.*

Consequently, the congress has explicitly recognized that while children must be protected from sexual predators, there is a cognizable difference when the age gap between offender and victim is relatively small. Since Davison's predicate offense involved

31

only a one year age gap, it is not the kind of offense that congress intended to trigger the life enhancement.

Once more, the rule of lenity supports the interpretation that the appellant urges upon the court. It is well established that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."

III. THE EVIDENCE WAS INSUFFICIENT CONCERNING ALL COUNTS OF CONVICTION.

### A.    Standard of Review

In assessing an appellate challenge for insufficiency of the evidence following a bench trial, findings on factual issues, other than the ultimate issue of guilt, are reviewed under the clearly erroneous test. See <u>United States v. Lockhart</u>, 382 F.3d 447 (4th Cir. 2004). In order to uphold a guilty verdict, taking the view most favorable to the government, a reviewing court must find that there is substantial evidence to support the verdict. <u>Furlong v. United States</u>, 332 F.3d 753 (4th Cir. 2003).

### B.    Discussion

The appellant's challenge to the sufficiency of the evidence will proceed on a count by count basis.

#### <u>Count One - Conspiracy to Produce Child Pornography</u>

At the outset, it should be noted that Tiffany Bolner established by her admission at trial and her false assertions concerning the April 28th letter that she had written following the trial, that she was wholly lacking in credibility. Indeed, the

trial judge, in acquitting the appellant on Count Six (Production Of Child Pornography) specifically found:

> "Tiffany Bolner ('Defendant Bolner') to have testified falsely as to various matters during the trial. As a result, the Court has not relied upon her testimony – except where the it has been corroborated reliable evidence – to establish Davison's guilt on any charge.

The record is devoid of any credible evidence that the appellant ever conspired with Tiffany Bolner to engage in sexual activities with C.W. *for the express purpose of producing pornographic images.* While there was little question that Bolner and Davison were actively engaged in the sexual molestation of the victim, there was no evidence that they ever discussed the production of images, encouraged one another to create such images, jointly looked at the images or discussed them, or encouraged C.W. to produce them. Nor was there any testimony or evidence that the Blackberry was passed between them (or a third party) when the images were "produced."

Unquestionably, the images that formed the basis of Counts Two and Three were "created" by C.W. herself. The testimony made it clear that she knew how to use the Blackberry and received no instruction or training from the defendants. Further, there was testimony that C.W. recorded images of herself before the videos in Counts Two and Three were produced. The Blackberry was normally available and C.W.'s use of it, as a camera, was unrestricted. While she was not free to consent to sexual activity, the choice to take videos of particular conduct was hers and her alone.

With respect to other images, C.W. added no significant evidence concerning who actually held the camera when they were produced.   There was nothing in her testimony that indicated that production of images was discussed by Bolner and Davison or discussed by either of them with her.   Indeed Bolner, who had clear incentive by virtue of her plea bargain to implicate the appellant in  a conspiracy provided nothing to support an agreement to  engage in sex with a minor for the purpose of producing the prohibited images.

One particular matter utilized by the court in reaching its verdict on the conspiracy count requires specific comment.   The court deemed it significant that Davison had communicated to C.W.'s mother the falsehood that he had a ten year old daughter.   Seemingly this statement was deemed to further the conspiracy.   (JA 1197)  An examination of the entire record shows that C.W. and Bolner had themselves created this fabrication months earlier to justify C.W.'s weekend visits.   There was nothing to indicate that the appellant counseled the deception or played any role in its creation.   It was not until late April 2010, when Bolner and Davison had moved to 8th Street that Davison even met C.W.'s mother (Kim Tusing).   While when questioned by Tusing, he might have  corroborated that he had a daughter, that statement alone hardly supports his involvement in the greater conspiracy.   First, there was no indication that any images were produced after the defendants move to 8th Street.   It made no sense for the appellant to dispute the earlier

misrepresentation by Bolner and C.W. To conclude that the statement, made in late April, evidenced participation in the conspiracy is purely speculative. If anything, it is far more reasonable to conclude that the communication was intended to allow continued access to C.W. for sexual purposes, clearly the appellant's primary goal.

It is well settled that to sustain the conspiracy conviction there must have been an *agreement* between Davison and Bolner to accomplish the illegal purpose. See <u>United States v. Ellis</u>, 121 F.3d 908 (4th Cir. 1997). Here the evidence did not indicate in any way that Bolner and Davison agreed to the production of any images. There was no planning or discussion of the matter. Nor was there any suggestion that images were recorded on anything but an *ad hoc* basis. Many of the sexual escapades clearly went un-photographed, clearly demonstrating a lack of conspiratorial agreement. Sexual misconduct with the victim was the sole joint goal. For the district court to conclude, based on the record, that Bolner and Davison agreed to produce the pornographic images was purely speculative and the guilty verdict must be vacated.

<u>Counts Two & Three</u>

The videos that form the basis of these counts were actually produced by C.W. The images themselves make that clear. The appellant adopts and incorporates the arguments made in the previous section dealing with C.W. knowledge concerning the use of the Blackberry and that it was constantly available to her. The actual

35

production of the prohibited image by the victim is somewhat unusual.

To violate the statute, the government must prove three elements: (1) the victim was under the age of eighteen; (2) the defendant used, persuaded, induced, enticed or coerced the victim to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and (3) the visual depiction was produced using material that had been transported in interstate commerce. See United States v. Malloy, 568 F.3d 166 (4th Cir. 2009).

The appellant does not dispute the first or third requirement. The question is whether Davison induced or enticed C.W. to take the images that are the basis of Counts Two and Three. As discussed in United States v. Broxmeyer, 616 F.3d 120 (2d Cir. 2010), the statute employs words of "causation." With respect to the images there is neither testimony nor evidence to indicate that C.W. was "caused" by the appellant to produce these images. Certainly, C.W. offered no such testimony. (JA 889-891) Indeed, C.W. was clear and unequivocal in this regard.

The record is wholly lacking in evidentiary support for the conclusion that the appellant produced or in any way caused the production of the images in Counts Two and Three. Clearly, the convictions on those counts must be vacated.

<u>Counts Four & Five</u>

As previously stated, these charges involve a video depicting C.W.'s masturbation of the appellant, and a still photograph involving oral sex. The Blackberry that produced the images cannot be seen. The decision on these counts involved a determination of who was holding the camera. C.W. could she no light on the question. Tiffany Bolner testified inconsistently, eventually indicating that it could have been either the appellant or herself. While at first denying that she was even present, she eventually conceded that her voice was overheard on the tape, and recognized by C.W. (JA 891)

Davison was unequivocal in his testimony that he did not use the Blackberry and that Bolner was on top of his upper body, lying perpendicularly, thus obscuring his vision while photographing the conduct. (JA 1015) Certainly, Bolner's voice on the tape placed her in the room. Nothing in the images themselves precluded the appellant's version as being the correct one.

Since the court claimed to wholly discount Bolner's testimony based on her lack of credibility, the only evidence on which its conclusion that Davison himself produced the images is the examination of the images themselves. Such an examination, simply does not reasonably permit the inference that it must have been the appellant who "produced" the images. The judgments on Counts Four and Five must, therefore, be vacated.

<u>Count Seven</u>

In Count Seven the appellant was convicted of possession of child pornography.  At trial, Davison maintained that he had no awareness of the 64 MB disk that was found abandoned in the 8th Street apartment. He only learned of it during his May 27, 2010 jailhouse conversation with Bolner.  With respect to that card, Bolner had testified that she deleted the images prior to her arrest.  While Davison admitted that the 2 GB memory card had been in his Blackberry, he denied any knowledge of the pornographic images found on that card.  The trial was replete with testimony that Bolner knew how to transfer images between memory card and computer.[14]  While Bolner denied knowledge of the 2 GB card, that representation was undercut by her general lack of credibility; her mother's maintenance of the MP3 player and the 2 GB card; her mailing of a photograph to the appellant that came from the 2GB card, and a destroyed letter in which she apparently asked her mother to destroy the 2 GB disk.

In essence, the court in reaching its verdict, depended wholly on the images that formed the basis of Counts Four and Five.  The court incorrectly concluded that Davison "beyond all doubt" created those images.  (JA 1195)  The appellant has already dealt with the creation of those images in the section dealing with Counts Four and Five.  He specifically adopts those arguments by reference and

---

[14]Implicit in such testimony is the clear inference that such knowledge would permit the transfer of images from one computer card to anther.

submits that they compel the conclusion that there was insufficient evidence to conclude that he possessed any child pornography. That conclusion compels that the judgment on Count Seven be vacated.

<u>Count Eight</u>

Following the court's guilty verdict on the charge that Davison obstructed justice by attempting to destroy evidence contained on various memory cards, (18 U.S.C. §§ 1512(c)(1) & (2) the, the U.S. Supreme Court decided <u>Fowler v. United States</u>, 131 S. Ct 2045 (2011)). <u>Fowler</u>, involving a would-be bank robber's murder of a local police officer to prevent further communication of his plans. Fowler was tried and convicted of a violation of 18 U.S.C. § 1512(a)(1)(C) which makes it a federal crime to "kill another person with intent to . . . prevent the communication by any person to a [Federal] law enforcement officer of information relating to the . . . possible commission of a Federal offense." Resolving a conflict among the circuits the Supreme Court held that, to establish the offense, the government must demonstrate that "there was a reasonable likelihood that a relevant communication would have been made to a federal officer."

As a result of that decision, the district court asked the parties to comment on whether <u>Fowler</u> affected it's guilty verdict on Davison's conviction for obstruction charge. Responding to the district court's request, the appellant argued that there was no reason why the Supreme Court's holding should not apply to another subsection of the same statute. He maintained that the reasonable

likelihood test applied equally to his attempts to destroy evidence of his wrongdoing. As support for his motion for a judgment of acquittal on Count Eight, he contended that there was absolutely no evidence that Davison, or anybody else involved in the case at the time the appellant contacted his sister, considered the possibility of federal prosecution or had any intention of derailing such a prosecution. Clearly, he saw the evidence as crucial to the state charges of child molestation. Paradoxically, it was the defendant's own efforts to hinder the state prosecution that brought the existence of pornographic evidence to the government's attention and culminated in his federal prosecution. Without the knowledge that the images existed, a federal nexus would have been lacking, and the case would have almost certainly remained in state court.

The decision in <u>Fowler</u>, clearly supplants the holding in <u>United States v. Perry</u>, 335 F.3d 316 (4th Cir. 2003), on which the district court had relied upon in reaching its original verdict. <u>Fowler</u> made it clear that the strict liability test of <u>Perry</u> was no longer good law. See <u>United States v. Wainwright</u>, 789 F. Supp. 2d 699 (E.Va. 2011).

Reconsidering the matter in light of <u>Fowler</u>, this court must reverse the district court's legal conclusion that the statute was violated by the appellant's conduct. The judgment on Count Eight, and the sentence imposed, must be vacated.

CONCLUSION

WHEREFORE, for the foregoing reasons, the appellant respectfully requests that this honorable court grant him the relief that he seek and vacate his conviction on all counts.

STATEMENT REGARDING ORAL ARGUMENT

Counsel requests oral argument in this matter. This is the 6th day of January, 2012.

                              Respectfully submitted,

                              /s/ Edward C. Sussman
                              Edward C. Sussman
                              Attorney for Appellant
                              Suite 900 - South Building
                              601 Pennsylvania Avenue N.W.
                              Washington, D.C. 20004
                              Tel: (202) 737-7110
                              Facsimile: (202) 347-1999
                              E-Mail: edwardsussman@yahoo.com

<u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed.
      R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

      [  ] this brief contains [XXXX] words, excluding the parts
      of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii),
      *or*

      [ X ] this brief uses a monospaced typeface and contains
      [*1,029*] lines of text, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed.
      R. App. P. 32(a)(5) and the type style requirements of Fed.
      R. App. P. 32(a)(6) because:

      [  ] this brief has been prepared in a proportionally
      spaced typeface using [*XXX*] in [*XXX*]; *or*

      [ X ] this brief has been prepared in a monospaced typeface
      using [*Wordperfect Office 12*] with [*10 characters per inch
      in Courier New*].


Dated: <u>January 6, 2012</u>          <u>/s/ Edward C. Sussman</u>
                                        *Counsel for Appellant*

<u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 6th day of January, 2012, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Paul E. Budlow
Kristi N. O'Malley
OFFICE OF THE U.S. ATTORNEY
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4917

*Counsel for Appellee*

I further certify that on this 6th day of January, 2012, I caused the required number of bound copies of the Brief of Appellant and Joint Appendix to be hand-filed with the Clerk of the Court, and one copy of the Joint Appendix to be served, via UPS Ground Transportation, upon Counsel for Appellee at the above address.

/s/ Edward C. Sussman
*Counsel for Appellant*