No. 11-4778

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**

**Appellee,**

**v.**

**JESSE AARON DAVISON,**

**Appellant.**

---

*Appeal from the United States District Court for the
District of Maryland, Northern Division
Honorable Marvin J. Garbis, District Judge*

---

**BRIEF OF APPELLEE
UNITED STATES OF AMERICA**

---

Rod J. Rosenstein
United States Attorney

Paul E. Budlow
Kristi N. O'Malley
Assistant United States Attorneys
Lindsey Carpenter, Law Clerk
36 South Charles Street, 4th floor
Baltimore, Maryland 21201
410-209-4800

April 2, 2012

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    The Abuse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   Disclosure of the Abuse and the Subsequent Investigation. . . . . . . . . . . . 5

III.  The Federal Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.   The Images and Videos. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    Video from February 7, 2012 (Count Two). . . . . . . . . . . . . . . . . 14

      B.    Videos and Images from February 11, 2010
            (including Count Three). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      C.    Images from February 20, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . 18

      D.    Video and Images from March 12, 2010
            (Including Counts Four and Five). . . . . . . . . . . . . . . . . . . . . . . . 18

      E.    Images from March 12, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.    Stipulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI.   The Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VII.  Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VIII. Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

-i-

SUMMARY OF ARGUMENT......................................... 25

ARGUMENT.................................................... 28

I.     THE DISTRICT COURT PROPERLY DENIED THE DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE.. .......................... 28

     A.     Standard of Review...................................... 28

     B.     The Defendant Lacks Standing to Challenge the Search of
Another Person's Home to Which He Had No Connection.. ...... 28

     C.     The Search Warrants that Led to the Discovery of Child
Pornography on the 2 GB SD Card Were Issued by
a Neutral and Detached Magistrate........................... 31

II.    DAVISON'S PRIOR CONVICTION TRIGGERED A MANDATORY
LIFE IMPRISONMENT TERM.. ............................... 34

     A.     Standard of Review...................................... 34

     B.     The District Court Was Required to Impose a Sentence
of Life Imprisonment..................................... 34

          1.     The Prior Sex Conviction Need Not Have a Federal
Nexus. ......................................... 36

          2.     The Age of The Victim of the Prior Sex Conviction
Need Not Be An Element of the Offense.. ................ 37

          3.     The Statute Unambiguously Applies to Davison's
Conviction Regardless of His Age or the Age Difference
Between the Defendant and the Victim of the Prior
Offense... ....................................... 38

III.   SUFFICIENT EVIDENCE SUPPORTED THE CONVICTIONS. . . . . . . 42

    A.   Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    B.   The Convictions on Counts One Through Five and Seven. . . . . . . 42

        1.   The Conspiracy Count (Count One).. . . . . . . . . . . . . . . . . . . 43

        2.   The Production Convictions (Counts Two Through Five). . . 46

        3.   The Child Pornography Conviction (Count Seven).. . . . . . . 50

    C.   The Conviction on Count Eight. . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

STATEMENT WITH RESPECT TO ORAL ARGUMENT. . . . . . . . . . . . . . . 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

-iii-

# TABLE OF AUTHORITIES

## CASES

*Barber v. Thomas,* 130 S. Ct. 2499 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Burks v. United States,* 437 U.S. 1 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Casella v. Borders*, 404 Fed. Appx. 800 (4th Cir. 2010). . . . . . . . . . . . . . . . .. 31

*Fowler v. United States,* 131 S. Ct. 2045 (2011). . . . . . . . . . . . . . . . . . . . . . *passim*

*Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319 (1979). . . . . . . . . . . . . . . . . . . . . . . 33

*Rakas v. Illinois,* 439 U.S. 128 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Baker,* 985 F.2d 1248 (4th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 43

*United States v. Beidler,* 110 F.3d 1064 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . 42

*United States v. Branch,* 537 F.3d 328 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . . 28

*United States v. Broxmeyer,* 616 F.3d 120 (2d Cir. 2010). . . . . . . . . . . . . . . 47-48

*United States v. Burgos,* 94 F.3d 849 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 49

*United States v. Depew,* 932 F.2d 324 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . 43

*United States v. Doss,* 630 F.3d 1181 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . 38

*United States v. Givens,* 733 F.2d 339 (4th Cir. 1984). . . . . . . . . . . . . . . . . . . . 30

*United States v. Horowitz,* 806 F.2d 1222 (4th Cir. 1986). . . . . . . . . . . . . . . 29, 30

*United States v. Joshua,* 607 F.3d 379 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . 34

*United States v. Lender,* 985 F.2d 151 (4th Cir. 1993). . . . . . . . . . . . . . . . . . . . 39

*United States v. Leon,* 468 U.S. 897 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*United States v. Malloy,* 568 F.3d 166 (4th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Manbeck,* 744 F.2d 360 (4th Cir. 1984). . . . . . . . . . . . . . . . . . . 28

*United States v. McKenzie-Gude,* __ F.3d __, 2011 WL 6276086
   (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Meredith,* 824 F.2d 1418 (4th Cir. 1987). . . . . . . . . . . . . . . . . . 43

*United States v. Perkins,* 363 F.3d 317 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . 28

*United States v. Ramirez,* 63 F.3d 937 (10th Cir. 1995). . . . . . . . . . . . . . . . 32, 33

*United States v. Roper,* 462 F.3d 336 (4th. Cir 2006). . . . . . . . . . . . . . . . . . . . . 39

*United States v. Servance,* 394 F.3d 222 (4th Cir.)(2005). . . . . . . . . . . . 31, 32, 33

*United States v. Starr,* 533 F.3d 985 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Wilkinson,* 137 F.3d 214 (4th Cir. 1998). . . . . . . . . . . . . . . . . . 42

## STATUTES

18 U.S.C. § 1512(a)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 52, 53, 54

18 U.S.C. § 1512(a)(1)(C) & (g)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

18 U.S.C. § 1512(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 54

18 U.S.C. § 1512(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 1512(f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

18 U.S.C. § 1512(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

18 U.S.C. § 2241(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. § 2251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 34, 41

18 U.S.C. § 2251(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

18 U.S.C. § 2252A(a)(5)(B). . . . . . . . . . . . . . . . . . . . . . . . 26, 50, 51

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3559(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3559(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

18 U.S.C. § 3559(e)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18 U.S.C. § 3559(e)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

18 U.S.C. § 3559(e)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. § 3559(e)(2)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

18 U.S.C. § 3742(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## OTHER AUTHORITIES

*Sand, et al.*, Modern Federal Jury Instructions, No. 62-26.. . . . . . . . . . . . . . . 51

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

I.     Whether the district court properly denied defendant's motion to suppress evidence obtained pursuant to a valid search warrant issued by a neutral and detached magistrate executed in good faith.

II.    Whether the district court correctly imposed a mandatory life sentence pursuant to 18 U.S.C. § 3559(e) after it found that the defendant had a prior sex conviction in which a minor was the victim.

III.   Whether the evidence was sufficient to find the defendant guilty of Counts One through Five, Seven, and Eight.

## STATEMENT OF THE CASE

The government agrees with the defendant's Statement of the Case, except to note additionally that the defendant received a concurrent 10-year sentence on Count Seven (possession of child pornography).

## STATEMENT OF FACTS

The facts in this case are tragic and disturbing. Jesse Davison ("Davison")

-1-

resided in Baltimore, Maryland, and was 26 years old at the time of the offenses charged in the Superseding Indictment. JA 908.[1] Co-defendant Tiffany Bolner ("Bolner") resided in Baltimore, Maryland, and was 20 years old at the time of the offenses. JA 851. The government proved at trial that Davison and Bolner repeatedly sexually abused an 11 year-old girl over the course of several months, and produced videos and images of that abuse.[2]

## I.     The Abuse

Victim CW is a minor female born in 1998. JA 579. She was 11 years old when she was sexually molested by Davison and Bolner. In 2009, CW was living part-time with her grandmother in the Brooklyn area of Baltimore City. JA 582-83, 851. At some time between late 2008 and early 2009, Bolner and her mother moved into an apartment across the street from where CW occasionally stayed with her grandmother. JA 618-19, 851. Bolner, then age 20, and CW, then age 10, became friends. JA 618-19, 851. CW often spent the night at Bolner's apartment. JA 356, 618, 852. Prior to the time Bolner started dating Davison, the

---

[1]     A redacted version of the Superseding Indictment was filed on the docket on February 14, 2011, which is the document contained in the Joint Appendix. JA 46-57.

[2]     Prior to trial, Bolner pled guilty to conspiracy to produce child pornography (Count One) and two counts of production of child pornography (Counts Two and Three). Bolner testified at trial as a witness for the government.

relationship between CW and Bolner did not have any sexual contact or inappropriate touching.  JA 851-53.

In the beginning of 2010, Bolner met Davison on MySpace, an online social network.  JA 620, 853, 911.  The two met in person shortly thereafter and became involved in a romantic relationship.  JA 623, 912-14.

From the time Bolner and Davison met, Bolner regularly took CW to spend weekends at Davison's various halfway houses in East Baltimore where he resided.  JA 855-57.  Although Davison had no children and lived in halfway houses, Davison and Bolner agreed to tell CW's family that Davison had a 10 year-old daughter named Megan who lived with him.  JA 586, 588, 591, 625-26, 855-56, 978-79.  The purpose of this ruse was to provide a plausible reason for CW to spend weekends at Davison's home.  JA 625-26, 979.

Indeed, CW spent many weekends with Davison and Bolner, and during these weekends, Davison and Bolner encouraged her to drink alcohol and provided her with cigarettes.  JA 646, 859-62, 866.  Beginning the first time CW spent the night, Davison and Bolner engaged in sexual intercourse in front of CW. JA 628, 916-17.  Davison also asked CW to hold his penis "all the time," while he was having intercourse with Bolner.  JA 861.  Despite CW's objections, Davison continued to touch her sexually and got her to participate in sex acts.  JA 861-69.

-3-

The abuse progressed to Davison and Bolner performing sex acts on CW, and

having CW perform sex acts on both of them.  JA 861-69.  Davison digitally

penetrated CW's vagina and performed oral sex on her on numerous occasions; he

also told CW that he unsuccessfully attempted to penetrate her vagina with his

penis while she was sleeping.  JA 861-66.  Davison continued to digitally

penetrate CW after she told him that "it hurt."  JA 867.  At Davison's repeated

insistence, CW masturbated Davison and Bolner, digitally penetrated Bolner, and

performed oral sex on Davison and Bolner.  JA 863-64.

Although CW initially said no to the Davison's requests to engage in these

sex acts, she ultimately agreed and performed them numerous times.  JA 862-64.

On one occasion, when CW resisted, Davison held CW down while Bolner

performed oral sex on CW.  JA 662-63, 867.  Every time CW spent the weekend

with Davison, he performed sex acts on her or made her perform sex acts on him.

JA 859-62, 866.

In early April 2010, Davison and Bolner moved from a halfway house in

East Baltimore to the second-floor apartment immediately next door to CW.  JA

661.  The abuse of CW continued at this apartment.  JA 662.  The evidence at trial,

through CW, Bolner, *and Davison*, established that no person, other than those

three, was ever present in the room when Davison and Bolner sexually abused CW

-4-

and had CW perform sex acts on them. JA 647, 654, 880, 1014.

Throughout the abuse, Davison and Bolner produced videos and photographs of their sexually explicit conduct with CW, using Davison's Blackberry Curve "smart phone." JA 631, 639, 871-72, 923. The videos and images were stored on at least two digital storage devices: a 64MB micro SD card and a 2GB micro SD card. JA 666, 943, 949. Davison frequently took pictures of CW and Bolner. JA 638-39, 871-72. The photos were "normal" at first, but later Davison took photographs and videos of CW while she was nude. JA 872, 631, 638-39. CW had no memory of taking any photographs or videos of sex acts herself. JA 872. CW observed that Davison stored the images on "cards" that he kept in "little clear cases," and that he did not allow anyone else access to the cards. JA 873-74. On one occasion, Davison and Bolner showed CW a video of herself performing oral sex on Bolner. JA 866. When asked by CW why he was taking the pictures and videos of CW, Davison told CW that the nude photos of CW "turned him on." JA 873.

## II.    Disclosure of the Abuse and the Subsequent Investigation

On May 20, 2010, Davison was arrested and charged with assaulting Bolner. JA 601. Following Davison's arrest, CW's mother was concerned for CW's safety and questioned CW about her interaction with Davison. JA 594.

CW's mother asked CW if Davison had "hit" her. JA 594. CW responded by disclosing the sexual abuse that had been occurring since February. JA 601-02. The police were notified, and CW was forensically interviewed by a social worker at the Baltimore City Child Abuse Center on May 26, 2010. JA 315. Davison and Bolner were subsequently charged in state court with sexually assaulting CW. JA 317-18.

Detective George Jones of the Baltimore City Police Department, Criminal Investigations, Child Abuse Unit, interviewed Bolner on May 24, 2010; at that interview, Bolner denied any sexual contact with CW by either her or Davison. JA 315. Following this interview, Bolner returned to the apartment that she had been sharing with Davison and deleted all of the images contained on the 64MB SD card. JA 667-68. At the time, the 64MB SD card was inside Davison's Blackberry Curve smart phone, which was used to take videos and images of the abuse of CW. JA 667-68. Bolner deleted the images in order to destroy evidence of the abuse of CW by her and Davison.

Bolner's mother, Neva Bolner, lived about half a block away from Davison's and Bolner's apartment. Following Bolner's arrest, Neva Bolner went to Davison's and Bolner's apartment with her other daughter, Kristina Randall, to remove Bolner's property. JA 358-62. According to Neva Bolner, Kristina

Randall removed nearly all of Bolner's property and took it to her house in Anne
Arundel County, Maryland. JA 362-63. Neva Bolner removed one item of her
daughter's: a red MP3 player. Kristina Randall gave Neva Bolner a Blackberry
that had been in Tiffany Bolner's possession at the time of her arrest. JA 363-64.
Neva Bolner stored both the MP3 player and the Blackberry in a set of drawers in
her bedroom at 3802 8th Street. JA 364.

In late May 2010, while incarcerated at the Baltimore City Detention
Center, Davison began to communicate with his sister, Laura Garland, by letter
and by telephone calls. JA 811-12. During one of the calls, Davison learned
about CW's allegations and Bolner's arrest from Garland. JA 812. Garland
described Davison's reaction as "scared." JA 812. After learning this
information, Davison instructed his sister to go to his apartment and get his
Blackberry mobile phone and a red MP3 player. JA 812. In the days following
this call, through additional calls and at least one letter, Davison continued to ask
Garland to go to the apartment and retrieve the Blackberry and the red MP3 player
because "there's things on it that could put him away for life." JA 813. Davison
also admitted to abusing CW, JA 920, but told Garland that CW initiated the
sexual contact. JA 1211.

Garland provided the police with a letter she received from Davison, dated

-7-

June 7, 2010.  In the letter, Davison wrote:

> I need you to call Tiffanys Mom, she should have the keys to our apt.,
> tell her you need my "Blackberry," it should be in the bedroom
> somewhere.  Once you get it, open the back to access the "SD card",
> not the "SIM card", but the "SD card", if it says "64 mb" I want you
> to flush it for me please.  If it says "2GB" then go through the videos
> and erase certain ones for me.  I need you laura, so please be here for
> me and help me.  Please don't cross me or leave me cold.  I truly need
> you right now.

JA 321, 322-24, 1209.

Instead of destroying the evidence as Davison requested, on June 17, 2010,
Garland called the Baltimore City Police Department, and turned over the June 7th
letter.  JA 123, 178.  On June 17, 2010, as officers were transporting Garland for a
formal interview, she received a telephone call from Davison.  JA 816.  During
this call, Davison again asked Garland to locate and destroy the memory cards.  JA
816-17.  Garland asked Davison to write her a letter explaining what happened
with CW.  JA 816.  Davison instructed his sister to get the keys to the apartment
from Bolner's mother, Neva Bolner, and that if the Blackberry and MP3 player
were not in the apartment, then they would be in Neva Bolner's possession.  JA
1209, 1211- 1213.

Following this conversation, Detective Dale Weese went to Davison's and
Bolner's apartment to view the house in anticipation of getting a search warrant.

JA 181.  While at the house, neighbors observed the detective and told him that

Bolner's relatives had been there on June 16, 2010, and removed property from the

apartment.  JA 181.  Detective Weese then went to 3802 8th Street and spoke to

Neva Bolner, who was present at the residence.  JA 181.  Neva Bolner confirmed

that she had been to the apartment with her daughter, Kristina Randall, and that

she and Randall had removed property from the apartment.  JA 181.

Detective Weese then took Garland to the Child Abuse Unit where she

provided a written statement and was interviewed by detectives.  JA 182-83.

Garland told the detectives that she was afraid of the defendant, and that he would

kill her if he knew she went to the police.  JA 133.

As a result of the information provided by Garland, as well as the

information gathered by Detective Weese, search and seizure warrants were

obtained for three locations: (1) the apartment formerly shared by Bolner and

Davison; (2) the house where Neva Bolner was renting a room; and (3) the home

of Kristina Randall.  JA 128-29, 325.

Detective Jones had never written a search warrant affidavit that contained a

source whose identity was not disclosed in the affidavit.  JA 133.  He consulted

the local prosecutor who was assigned to the case, and she also had not handled a

similar case.  JA 133.  Detective Jones then spoke to Baltimore City District Judge

-9-

Jeannie Hong, the duty judge that night.  JA 134.  Detective Jones explained the

details of the case and his concern for the safety of Garland to Judge Hong.  JA

134.  Specifically, he told Judge Hong that Garland was Davison's sister, and that

she believed her brother would kill her if he found out that she had provided

information to law enforcement.  JA 134-35.  Detective Jones and Judge Hong

agreed to use the phrase "name not given for safety reasons" in place of Garland's

name.  JA 135.  Detective Jones drafted the affidavit and other documents, and

arranged to meet with Judge Hong.  JA 135.  Detectives Jones and Weese were co-

affiants on all three warrants.  JA 136.  Judge Hong read the warrants in their

presence, placed the detectives under oath, and they swore to the accuracy of the

facts in the affidavits.  Judge Hong signed the warrants authorizing the search of

the three residences.  JA 136-37.

 The warrants were executed that evening.  During the search of Neva

Bolner's residence, Detectives seized the red MP3 player that contained a 2GB SD

card and Davison's Blackberry, among other items.  JA 325-28.  The SD card slot

in the back of the Blackberry was empty.  JA 327-28.

 In a June 18, 2010 letter to his sister, Davison again asked Garland to

destroy images from the SD cards, and he also described some of the contents of

the 64 MB card, including a video where CW's hair is in a bun.  JA 1211.

Davison also made calls to Garland from jail that were recorded, and these calls

were admitted into evidence, along with the transcripts of the calls.  JA 818, 821,

1215-43.  During the June 23, 2010 call, while explaining to Garland that the

images on the cards will prove the state's case, and expressing his hope that

Bolner deleted everything, Davison told his sister, "[b]ecause if ..., if she got to the

phone, she would have erased it and everything....  She knows *how I used to hide*

everything in there."  JA 1231 (emphasis added).  The letters and calls from

Davison to Garland in which he urged Garland to get the Blackberry and MP3

player and destroy the SD cards provided the factual basis for the finding of guilt

on Count Eight (tampering with objects or proceedings).

     Letters written from Davison to Bolner were also admitted.  In a letter to

Bolner dated June 28, 2010, Davison stated:

> Now I received your letter dated on the 21st and 22nd and you
> mentioned that the Blackberry deleted everything.  My question for
> you is, did you go into the videos and pictures and delete those as
> well?  Because we both know what's on there and it can hurt us both.
> Please let me know when you write back.  Remember how I used to
> hide the pictures?  Did you delete them?  Let me know.

JA 673.  And in another letter from Davison to Bolner dated July 3, 2010, Davison

stated:

> Now, the only thing in question is my phone and MP3 player.  The
> cops have both.  Your mom gave them to them.  Is there still anything

-11-

on my phone, videos, pictures?  Did you delete anything on my phone
yourself?  I have the SD card with all the music and all my pictures of
us and all in the MP3.

JA 675.  In a letter dated July 9, 2010, Davison wrote:

So I know they found something on my phone and MP3 player and
we're both in the pictures, Baby.  So they're probably going to do you
the same way...  But if we are caught up through the pictures, then
we're going to have to plead guilty to them.

JA 676-77.  In a letter dated October 7, 2010, Davison described in detail a

number of the videos that he believed were in the police's possession, and then

stated, "These are the only videos I remember being on the SD card."  JA 678-79.

## III.   The Federal Investigation

FBI Special Agent Rachel Corn testified that she is a member of the

Maryland Child Exploitation Task Force, and that she investigates federal

violations of child exploitation.  JA 487.  Agent Corn testified that the federal

investigation into Davison and Bolner began in September 2010, while both were

still awaiting trial on state child sex abuse charges.  JA 489.  Agent Corn visited

Davison's and Bolner's apartment on two occasions, in an effort to take

photographs of the location of the abuse.  JA 493-94.  The first time was on

September 28, 2010, and the second time was on October 1, 2010.  JA 494.  Both

times she was searching the house with the consent of the landlord, who had

already evicted Bolner and removed all of the property. JA 198-99. On October

1, 2010, while inside the apartment, Agent Corn observed a micro SD card on the

carpeted floor of one of the rooms. JA 495-96. The card was a SanDisk 64MB

Micro SD card. JA 496. This was the same type of card that Davison had been

urgently asking his sister to find and destroy. JA 1209.

     Both the 64MB SD card found in Davison's and Bolner's apartment on

October 1, 2010, and the 2GB SD card found inside the red MP3 player in Neva

Bolner's apartment on June 17, 2010, were forensically examined by members of

the Cyber Electronic Crimes Unit of the Baltimore City Police Department. JA

391, 392, 426-27, 479, 498. Both the 64MB SD card and the 2GB SD card

contained files that were created while the card was inside a Blackberry Curve. JA

400-03, 408, 453.

     The contents of the 2GB SD card included contacts, music files,

photographs, and videos. JA 408-09. Many of the photographs were of Davison,

Bolner and CW. Two of the videos contained sexually explicit conduct involving

CW and formed the basis of Counts Two and Four of the Superseding Indictment.

JA 513-14, 533.

     The forensic examination of the 64MB SD card revealed that nearly all of

the files, photographs, and videos had been deleted. JA 460-63. Many of the

deleted files were forensically recovered.  JA 443-44, 461.  Most of the videos and

other images were created using a Blackberry Curve.  JA 453, 457.  The recovered

files included a folder named in CW's first name, videos, and photographs.  JA

433.  Many of the photographs were similar or identical to those found on the 2GB

SD card that was seized from Neva Bolner's bedroom on June 17, 2010.  Many of

the files contained sexually explicit conduct involving Davison, Bolner, and CW.

Two of the files formed the basis of Counts Three and Five of the Superseding

Indictment.  JA 518-19, 535.

## IV.    The Images and Videos

Images and videos from the 64 MB SD card and the 2 GB SD card were

admitted at trial.[3]  Below are descriptions of the images and videos that related to

the counts of conviction, as well as other relevant images, in chronological order:

### A.    Video from February 7, 2010 (Count Two)

Count Two is a video from the 2GB SD card, approximately nine minutes in

length and is titled "VID 00009-20100207-2103.3GP."  SJA 142, 149.  The video

was created on February 7, 2010.  JA 513.  The video was taken by CW, who was

---

[3]    The sealed volume of the Supplemental Joint Appendix contains a one-inch
binder of evidence under seal.  The binder contains: (1) Government's Exhibit 40
(a summary exhibit that contains images from 2 SD cards in chronological order,
including "screen shots" from videos); and (2) a DVD containing four video files,
three of which were the bases for Counts Two, Three, and Four.

using Davison's Blackberry Curve.  Throughout the video, CW is sitting between Bolner's legs, and CW's pajama pants can be seen inches from Davison's hands while he masturbated Bolner.  The faces of Davison, Bolner, and CW are all clearly shown on the video, and all three are clearly aware of the video camera.

The beginning of the video depicts Davison masturbating Bolner's vagina with his hands.  Approximately two minutes and 39 seconds into the video, CW says, "We're making an hour video."  Davison responds, "Glen Burnie Girls Gone Wild.  Woo woo!"  At approximately four minutes and five seconds into the video, CW moves the camera to show Davison's face, at which time Davison says, "Hold it right there," and "get them faces," as he smiles at the camera.  The video then pans to Bolner and then back to Davison, who again smiles at the video camera. As both Davison and Bolner laugh, Bolner states, "Cut the video."

Immediately after Bolner says "Cut the video," Davison takes CW's hand and uses it to rub Bolner's left breast and states, "You gonna come, you gonna come.  She got your titties, I got your pussy."  As the video continues, CW penetrates Bolner's vagina with her hand as Davison touches Bolner's vaginal area.  JA 641, 644.  The video also depicts Davison performing oral sex on Bolner.

On direct examination, Davison stated, "Up until the point where she said

-15-

she was recording, I didn't know that she was recording." JA 924. He also

testified in response to counsel's question about how the videos and photographs

were taken, "If and when any pictures were taken, it was either somebody grabbed

the phone and just wanted to take them as it was going on, or that's basically how

it happened." JA 930. During cross-examination, Davison agreed that he heard

CW say "We're making an hour video," JA 994, and that he responded, "Glen

Burnie Girls Gone Wild. Woo woo!" JA 993. He admitted that his comment was

a reference to the commercial video series, "Girls Gone Wild," which depicts

young women exposing their breasts for roaming video cameras. JA 993-95.

After listening to more of the audio, Davison testified that he did say "Hold it right

there," but was unsure if he said "faces," but "it possibly could have been." JA

997-99. He agreed that Bolner said, "Cut the video." JA 1000. Despite these

comments, Davison testified that he did not *know* that a video was being made,

although he agreed that "it was a possibility." JA 995, 1000. According to

Davison, CW could have been playing a game on the Blackberry. JA 995-96.

Davison conceded that following these comments about recording a video, he

assisted CW as she stimulated Bolner's vagina. JA 996.

-16-

**B.    Videos and Images from February 11, 2010 (including Count Three)**

The district judge was shown a video from the 64MB SD card, approximately 47 seconds in length, that was created on February 11, 2010 at 8:27 p.m.  JA 518-19; SJA 142, 150.  The video shows CW on a bed holding a bottle of alcohol.  CW is seen hitting herself on the head and thrashing around, at times in a sexual manner.  CW was "drunk" at the time this video was produced.  JA 649.  CW testified that Davison and Bolner regularly gave her alcohol, but she had no specific memory of this event.  JA 104-05.

Count Three was based on another video from the 64MB SD card, approximately four minutes in length, that was created on February 11, 2010, at 8:48 p.m.  JA 519; SJA 142, 151.  The beginning of this video shows Davison assisting CW as CW penetrates Bolner's vagina digitally.  JA 649-50.  Davison's and CW's hands are both seen, and Davison can be heard instructing CW during the first 27 seconds of video, before the sound cuts out.  Davison can be heard telling CW, "There you go.  Don't try to go fast, just like that."  JA 1004.  As the video progresses, Davison uses CW's hand to masturbate Bolner.  JA 649-50.  Approximately one minute and 14 seconds into the video, the video captures the faces of Bolner, Davison, and CW.

-17-

During his testimony, Davison admitted that this video depicts him assisting

and coaching CW as she touches Bolner's vagina with her hand.  JA 1003-06.

### C.    Images from February 20, 2010

The 64MB SD card also contained a series of photographs that were

introduced into evidence from February 20, 2010 that are not the subject of a

specific count.  Two such photos are described as follows:

- Government's Exhibit 40-11:  Created at 12:13:08 a.m., depicting
  CW, wearing plaid, sitting with her back to the camera, in between
  Bolner's spread legs.  JA 513; SJA 157.  CW and Bolner testified that
  this image depicts CW stimulating Bolner's vagina with her fingers.
  JA 652, 877.  A third person's leg is seen in the photograph from the
  direction of the photographer.  During cross-examination, Davison
  admitted that this image depicted Bolner and CW, and that the third
  person's leg was his.  JA 986.  He also admitted that neither CW or
  Bolner could have taken the photo.  JA 986.  The district court found
  as a matter of fact that Davison was the third person and that Davison
  took this photograph.

- Government's Exhibit 40-12: Created at 12:42 a.m., depicting CW,
  wearing a plaid bra, with a blanket wrapped around her stomach.  CW
  has her left hand to her mouth and her right hand on Davison's erect
  penis.  JA 531; SJA 158.  The photograph is taken from the direction
  of Davison's upper torso, looking down towards his feet.  Davison
  agreed that CW could not and did not take this image.  JA 986.

### D.    Videos and Images from March 12, 2010 (Including Counts Four and Five)

The images at issue in Counts Four and Five are part of a larger series of

images and video that were produced on March 12, 2010.  The image and video

-18-

that form the bases for Counts Four and Five are approximately four minutes apart.  Multiple images taken in the few minutes before and after these charged images document the sexual exploitation of CW that occurred on the night of March 12, 2010.

<u>Count Four</u>

Count Four is based on a video from the 2GB SD card, approximately 13 seconds in length, and is titled "VID 00024-20100312-2234.3GP."  JA 533; SJA 142, 161.  The video was created on March 12, 2010, at 10:34 p.m.  This video depicts a nude CW, sitting cross-legged across Davison's legs, masturbating Davison's penis with her hands. The video is taken from the direction of Davison's upper torso.  The district court found that Davison personally produced this video.  JA 1195-96.

Following that video, there are five photographs of CW and Davison taken in the next two minutes.  SJA 162-66.  CW is nude, her hair is in a bun, and she is wearing a necklace that was given to her as a gift by her grandparents.  JA 874-75. Three of the photos show CW's hand on Davison's penis, and are taken from the same vantage point as the video in Count Four.  SJA 163-65.  The fifth photo, taken at 10:36:52 p.m., shows Davison's penis and his abdomen, including his identifiable tattoo.  JA 660; SJA 166.

-19-

Count Five

Count Five is based on a photograph from the 64MB SD card, and was created on March 12, 2010, at 10:37 p.m., immediately after the images just described. JA 535; SJA 167. The image depicts CW performing fellatio on Davison, and the photograph is taken from the area of Davison's upper torso.

As to the March 12, 2010 images and video just described, Davison testified that the images and videos were taken without his knowledge, by Bolner, as she laid across his chest while CW was performing sex acts on him. JA 1011-17. A review of the images reveals that Bolner is, as Davison described, "heavyset." JA 1015. Davison's testimony that Bolner produced these images and video while she was sitting across his chest and while CW was performing the sex acts on Davison, is quite simply, impossible to believe. The district court found Davison's testimony on this point "just not believable." JA 1199.[4]

## E.     Images from March 12, 2010

Government's Exhibit 40-24 is a photograph taken on March 12, 2010, at

---

[4]     In his brief, Davison claims that Bolner testified she could have taken this video, and that the video shows both of Davison's hands. Def. Br. 16. Bolner never testified to these facts. Rather, Bolner denied taking this video, JA 658, and during the cross-examination (conducted by Davison), Davison did *not* ask Bolner if she took this video. The citation provided by Davison is to Bolner's testimony regarding Government's Exhibit 40-13, a photograph of Davison and CW clothed, sitting on a couch. JA 728-29.

11:04 p.m. and depicts CW performing oral sex on Bolner, and is taken from above the participants on Bolner's left side. JA 536; SJA 170. CW testified that Davison was present at the time the conduct in this photograph occurred, that the conduct was Davison's idea, and that nobody else was in the room at the time. JA 880-81. Davison testified on cross-examination that he "might have" taken this photograph. JA 987-88. The district court found as a matter of fact that Davison took this photograph.

Government's Exhibit 40-25 is a photograph taken on March 12, 2010, at 11:05 p.m., approximately one minute after Exhibit 40-24, and is a close-up of CW's vagina, while CW is lying on her stomach on a blanket. JA 535; SJA 171.

## V.    Stipulations

The government and the defense stipulated that the defendant's Blackberry Curve and the two SD cards were made outside the United States and affected interstate commerce. SJA 3-4. The government and the defense also stipulated to the fact that Davison had a prior conviction for attempted rape in the first degree which involved force or the threat of force, and that the victim of the attempted rape had not reached the age of 17. JA 310; SJA 1-2.

## VI.    The Defense Case

Davison testified as the sole witness for the defense. Davison testified that

he is sexually attracted to young girls, JA 960-61, that he considers himself a pedophile, JA 961, and that he "loved" CW. JA 960. Davison further testified that he and Bolner had intercourse in front of CW, JA 920, purchased alcohol and allowed CW to drink it, JA 966, and that he engaged in sex acts with CW starting very shortly after he met CW. JA 920. Davison testified that CW stayed at his house every weekend, and that he engaged in sex acts with CW "almost every single time" she stayed at his house. JA 921. Davison testified that CW touched his penis with her hands "on multiple occasions," JA 963, and that she touched his penis with her mouth. JA 963.

Davison further admitted that the sex acts occurred more frequently than those depicted in the videos and images. JA 958. He denied using physical force, and testified that the sex acts were "mutual" between CW, Bolner, and himself. JA 976. Davison claimed that he did not take any of the photographs or videos that were the subject of the charged counts, and that he did not know that the images and videos were being captured. JA 964-65. However, he admitted that he owned the Blackberry that produced the videos and images as well as the 2GB SD card that stored many of them. JA 967-68.

Davison testified that he asked Bolner to commit perjury in order to avoid prosecution and convictions for their sexual assault of CW. JA 976. Davison

-22-

testified that in a letter to Bolner dated September 29, 2010, in which he

referenced the video of CW masturbating him (Count Five), he was telling Bolner

to lie, and he was also telling Bolner to claim that the female in the video (CW)

was a prostitute.  JA 976.  He also testified that he asked Bolner to falsely testify

that CW never slept in their bed.  JA 981.

## VII.  Verdict

On May 12, 2011, following closing arguments by the parties, the district

court rendered its verdict orally, in open court.  The trial court convicted Davison

on Counts One (conspiracy to produce child pornography), Two-Five (production

of child pornography), Seven (possession of child pornography), and Eight

(tampering with objects and proceedings).  The district court also found, as alleged

in the Notice of Special Findings of the Superseding Indictment, that Davison had

a prior sex conviction in which a minor was the victim, for purposes of 18 U.S.C.

§ 3559(e).

As to Count Seven, the district court found that a number of the images

taken of CW clearly constituted child pornography and that Davison took many of

those images.  JA 1195.  The district court also found that Davison possessed

those images at the moment he took them, which was part of the basis for his

finding of guilt as to Count Seven.  JA 1196.  The court found that Davison

possessed other videos and pictures found on the SD cards from his Blackberry and MP3 player even if he did not take some of the videos and pictures. JA 1196.

As to Count One, the court found that Davison and Bolner conspired to induce CW to engage in sexually explicit conduct for the purpose of producing these images and videos, and that Davison and Bolner "had as an objective to use [CW] to engage in sexually explicit conduct," and to "take pictures" of that conduct. JA 1198-99.

In convicting the defendant of Counts Two through Five, the court specifically found that Davison took the video and picture that are the basis for Counts Four and Five, JA 1195-96, and that as to Counts Two and Three, the videos were taken as part of the conspiracy, establishing Davison's guilt. JA 1199-1200.[5]

## VIII. Sentencing

Finding 18 U.S.C. § 3559(e) applicable, the district court sentenced Davison to life imprisonment on Counts One through Five, 10 years' imprisonment on Count Seven, and five years' imprisonment on Count Eight. JA 1248GGG. The sentences were imposed concurrent with each other, and the trial court also imposed a term of supervised release for life. JA 1248IIII.

---

[5]    The district court acquitted Davison on Count 6. SJA 30-34.

-24-

# SUMMARY OF ARGUMENT

I.     Davison lacks standing to challenge the warranted search of Neva Bolner's bedroom drawer, where he had no expectation of privacy.  Even if Davison has standing to challenge the search, the evidence obtained under the warrant was properly admissible because the warrant was signed by a neutral and detached magistrate who did not abandon her role when she assisted the affiant to the search warrant in choosing the words "name not given for safety reasons" to identify a source.  In addition, even if this Court were to conclude that the magistrate erred by suggesting how to refer to the informant in the affidavit, the good faith exception to the exclusionary rule nevertheless would be applicable, thereby allowing the introduction of the evidence.

II.     The district court correctly sentenced Davison to a mandatory term of life imprisonment after it found beyond a reasonable doubt that Davison had committed a prior sex offense in which the victim was a minor.  Under 18 U.S.C. § 3559(e), the prior state sex offense need not have a federal nexus, and need not have the age of the minor as an element of the crime.  Further, the statute unambiguously applies to Davison, who was previously charged, convicted, and sentenced as an adult under Maryland law for attempted first degree rape.  It is irrelevant that Davison himself was a minor when he committed the offense of

-25-

attempted rape in the first degree, and that he was only approximately one year older than his victim in that prior offense. The statute defers to state law to determine whether a prior sex offense under that state law counts for purposes of section 3559(e).

III. **Ample evidence supports all of Davison's convictions.**

A.     With respect to the convictions under 18 U.S.C. § 2251 and 2252A(a)(5)(B), the evidence established that Davison is a self-admitted pedophile who initiated a sexual relationship with 11 year-old CW shortly after meeting her. He plied her with alcohol and enticed her to repeatedly perform sex acts on him and Bolner. Davison also performed sex acts on CW. The abuse occurred over a number of months, and numerous videos and photographs were taken of the abuse using Davison's Blackberry, and stored on SD cards that he controlled. Davison took nude photos of CW because "it turned him on," and Bolner testified that after the first sexual abuse of the victim, she came to expect that images and videos would be produced. The images and videos themselves establish that Davison was aware of the videos and images, and that he produced many of them. In addition, following his arrest in state court, Davison placed phone calls and wrote letters to his sister asking her to retrieve the discs containing the images and videos and to destroy them, because "there's things on

-26-

it that could put him away for life." Davison also wrote letters to Bolner in which he wanted her to confirm that she had destroyed all of the images, even those that he hid. In his letters to Bolner and his sister, Davison accurately described the content of some of the depictions.

    B. The evidence also supported Davison's conviction for tampering with objects or proceedings under 18 U.S.C. § 1512(c)(1). The Supreme Court's decision in *Fowler* applies to a different subsection of the witness tampering statute, 18 U.S.C. § 1512(a)(1)(C). The significantly different wording of the two subsections militates against application of *Fowler*'s "reasonable likelihood" standard in this case. Even if that standard is applied, the government introduced sufficient evidence from which the district court, as the trier of fact, could infer that, at the time Davison attempted to destroy the memory cards, it was reasonably likely that his case would be referred to federal authorities for prosecution. Even if there was any error in the trial court's verdict on Count Eight, the error was harmless, as the judge explained that a retrial on Count Eight would be a meaningless act. Given the undisputed facts that the government proffered when suggesting that the court allow the government to reopen the case, it is clear that the district court was correct to find that any error was harmless.

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY DENIED THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.

### A. Standard of Review

This Court reviews a district court's legal conclusions made in the course of a denial of a motion to suppress evidence *de novo* and its factual findings for clear error. *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). "Because the district court denied the motion to suppress, [this Court] construe[s] the evidence in the light most favorable to the government." *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004).

### B. The Defendant Lacks Standing to Challenge the Search of Another Person's Home to Which He Had No Connection.

To assert a Fourth Amendment violation, a defendant must first establish that he has a "legitimate expectation of privacy in the area searched," rather than the contents therein. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Manbeck*, 744 F.2d 360, 374 (4th Cir. 1984) ("The privacy interest that must be established to support standing is an interest in the area searched, not an interest in the items found."). Although an interest in the items seized may be a factor in determining whether there is a privacy interest in the area searched, "ownership of the item seized is, by itself, insufficient to confer a privacy interest in the area

-28-

searched." *Id.* The burden is on the defendant to prove his reasonable expectation of privacy. *United States v. Horowitz,* 806 F.2d 1222, 1224 (4th Cir. 1986).

In *Horowitz*, this Court established a three-part test to determine whether a defendant maintains a reasonable expectation of privacy sufficient to confer standing to assert a Fourth Amendment challenge to a search. First, the Court analyzes the defendant's "interest in and control of the area searched." *Id*. at 1225. Second, the Court evaluates the defendant's "subjective expectation of privacy in the area as evidenced by his efforts to ensure that privacy." *Id*. Third, the Court looks at "society's willingness to recognize his expectation as reasonable." *Id*.

The district court correctly concluded that Davison lacked standing to challenge the search that led to the discovery of the 2GB SD card, as Davison's claim fails all three parts of the test set forth in *Horowitz*. The 2GB SD card was located inside the red MP3 player that was seized during the search of Neva Bolner's home on June 17, 2010. JA 326. The MP3 player was found inside a set of drawers in Neva Bolner's bedroom. JA 326. Davison offered no evidence to the district court that he exercised any interest or control over a room Neva Bolner rented in a separate home from his own where he lacked "physical presence in, or access to the area to be searched" and "the ability to exclude others." *Horowitz*, 806 F.2d at 1226 (citations omitted). Even if Davison visited Neva Bolner's home

-29-

on occasion before he was incarcerated, that would be insufficient to establish control over her residence. *See Horowitz*, 806 F.2d at 1226 (occasional presence, without any right to exclude others is not enough to create expectation of privacy). Likewise, there is no evidence that Davison had a subjective expectation of privacy in Neva Bolner's residence. Finally, even if Davison were to produce evidence of a credible subjective expectation of privacy in the bedroom of his girlfriend's mother where he had never been and did not even know contained his abandoned belongings, this is certainly not an expectation of privacy that society would be willing to recognize as reasonable. *See United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984).

Finally, Davison did not even take steps to ensure the privacy of the memory card itself before he was aware it had been removed from the apartment he shared with Bolner at Bolner's request and by Bolner's relatives.[6] In fact, he specifically asked his sister to obtain the 2 GB SD card from the house where he previously resided in order to access it and delete certain files. Thus, any subjective expectation of privacy he may have had in the card or its contents was

---

[6]     The district court correctly noted that the contents of the the 2 GB SD card were readily available to Neva Bolner and Kristina Randall, in support of its finding that Davison did not have a reasonable expectation of privacy in its contents. JA 267.

certainly not reasonable. *See Casella v. Borders*, 404 Fed. Appx. 800, 803-04 (4th Cir. 2010) (unpublished) (finding that individual lacked reasonable expectation of privacy in contents of cell phone she lent to boyfriend because she lacked dominion and control over that phone when it was seized by officers incident to her boyfriend's arrest).

> **C.**    **The Search Warrants that Led to the Discovery of Child Pornography on the 2 GB SD Card Were Issued by a Neutral and Detached Magistrate.**

Although Davison lacks standing to challenge the search that led to the discovery of the 2 GB SD card and the images contained thereon, his argument about the validity of the warrant is wholly lacking in merit.

Under the Fourth Amendment, "a judicial officer who issues a search warrant must act in a neutral and detached manner." *United States v. Servance*, 394 F.3d 222, 231 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005). A judicial officer who is neutral and detached must not act as "an adjunct law enforcement officer," or "function[] as a rubber stamp for the police." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)).

To determine whether a judicial officer acted in a neutral or detached manner, this Court looks to the level of involvement of the judicial officer in the warrant application process. In *Servance*, 394 F.3d at 231-32, this Court found

that a judicial officer's assistance in rewriting portions of a warrant affidavit was "a far cry from the conduct which might compromise a judicial officer's neutrality and detachment" where a trooper went to a judicial officer's house at night and received assistance in deleting unnecessary phrases and including a more precise description of the property to be searched. Similarly, in *United States v. Ramirez*, 63 F.3d 937, 941 (10th Cir. 1995), the Tenth Circuit held that a judicial officer did not abandon his neutral and detached role when making additions to a draft affidavit for the search of a building to allow officers to also search the defendant himself and seize a key to the building because those additions were "mere common sense extensions of the contents of the narrative portion of the same affidavit."

In this case, the district court properly concluded that Judge Hong did not abandon her neutral and detached role as a magistrate by suggesting that Detective Jones use "name not given for safety reasons" to refer to a source that he was trying to protect, where Detective Jones had never authored an affidavit using a confidential source. Judge Hong's actions are even less intrusive in the affidavit process than those at issue in *Ramirez* and *Servance*. Judge Hong merely suggested to the affiant what name to use for the informant, rather than actually changing the name herself on the affidavit. Additionally, suggesting a code name

-32-

for an informant has far less bearing on the probable cause present in an affidavit than suggesting that more precise descriptions be used for property to be searched or items added to the warrant list as was the case in *Servance* and *Ramirez*. Nothing Judge Hong suggested affected the probable cause determination.[7]

In short, the district court correctly admitted the evidence seized from Neva Bolner's residence pursuant to the search warrant.[8]

---

[7]    *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979), is readily distinguishable.  In *Lo-Ji Sales*, the Town Justice assisted, if not led, law enforcement officers in a search for obscene materials pursuant to the warrant that he had signed.  422 U.S. at 321-22.  The Supreme Court held that the Town Justice abandoned his neutral and detached role when he became such an active member in the execution of the warrant. *Id*. at 326-27.  In contrast, the judicial officer in this case merely offered a suggestion about how to refer to an informant to ensure her safety.

[8]    Even if this Court were to conclude that Judge Hong erred by suggesting how to refer to Ms. Garland in the affidavit, the good faith exception to the exclusionary rule nevertheless would be applicable, thereby allowing the introduction of the evidence. *See Leon*, 468 U.S. at 920.  Davison does not contend that the officers lacked probable cause to believe that evidence of a crime would be found at Ms. Bolner's residence.  Thus, it would not serve the policy of the exclusionary rule to exclude the evidence in this case. *See United States v. McKenzie-Gude*, __ F.3d __, 2011 WL 6276086 (4th Cir. 2011).

## II.   DAVISON'S PRIOR CONVICTION TRIGGERED A MANDATORY LIFE IMPRISONMENT TERM.

### A.   Standard of Review

This Court reviews issues of statutory interpretation *de novo*. *United States v. Joshua*, 607 F.3d 379, 382 (4th Cir. 2010).

### B.   The District Court Was Required to Impose a Sentence of Life Imprisonment.

"A person who is convicted of a Federal sex offense in which a minor is the victim shall be sentenced to life imprisonment if the person has a prior sex conviction in which a minor was the victim, unless the sentence of death is imposed."  18 U.S.C. § 3559(e)(1).  By definition, a violation of 18 U.S.C. § 2251 (the statute of conviction for Counts One through Five) is a "Federal sex offense" for purposes of this statute.  18 U.S.C. § 3559(e)(2)(A).  Accordingly, the convictions on Counts 1 through 5 each trigger this first criterion: Davison was convicted of a federal sex offense in which minor is the victim.  It is the second provision of section 3559(e)(1) that Davison challenges: that is, whether his prior conviction for attempting to forcibly rape a 15 year-old meets the definition of "a prior sex conviction in which a minor was the victim."

"[T]he term 'prior sex conviction' means a conviction for which the sentence was imposed before the conduct occurred constituting the subsequent

-34-

Federal sex offense, and which was for a Federal sex offense or a State sex

offense."  18 U.S.C. § 3559(e)(2)(C).  In that regard, section 3559(e)(2)(B) defines

a "State sex offense"as

> . . . an offense under State law that is punishable by more than one
> year in prison and consists of conduct that would be a Federal sex
> offense if, to the extent or in the manner specified in the applicable
> provision of this title--
>
> (i) the offense involved interstate or foreign commerce, or the use of
> the mails; or
>
> (ii) the conduct occurred in any commonwealth, territory, or
> possession of the United States, within the special maritime and
> territorial jurisdiction of the United States, in a Federal prison, on any
> land or building owned by, leased to, or otherwise used by or under
> the control of the Government of the United States, or in the Indian
> country ...

Accordingly, the prior conviction must "consist of conduct" that would be a

federal sex offense if it had occurred in a manner or venue that would give rise to

federal jurisdiction.

It is not disputed that Davison's convictions in this case under Counts One

through Five were each a federal sex offense, nor is it disputed that Davison's

prior conviction (attempted first degree rape) consists of conduct that would also

constitute a federal sex offense (aggravated sexual abuse by force or threat under

18 U.S.C. §2241(a)) had it occurred within federal jurisdiction.  However,

-35-

Davison argues that the district court erred in applying 18 U.S.C. § 3559(e)(1) because: (1) the state conviction did not involve interstate or foreign commerce or the use of the mail; (2) the age of the victim of the predicate crime was not an element of the prior offense of conviction, rendering the statute ambiguous; and (3) Congress did not intend the mandatory life sentence in section 3559(e) to apply to a defendant who was a minor himself at the time of the prior offense or in a situation where the victim and the offender were close in age. Davison's arguments are premised on a flawed analysis of the sentencing statue, which by its clear terms applies to prior offenses of purely state crimes involving minor victims, regardless of the age of the offender.

### 1. The Prior Sex Conviction Need Not Have a Federal Nexus.

Davison argues that his prior Maryland conviction does not meet the statutory definition of "state sex offense" under section 3559(e) because the crime occurred in a private residence. *See* Def. Br. 30. The definition of a prior sex conviction, however, includes "an offense under State law that is punishable by more than one year in prison and consists of conduct that *would be* a Federal sex offense *if*" it involved interstate or foreign commerce *or* occurred within federal jurisdiction. 18 U.S.C. § 3559(e)(2)(B) (emphasis added). Thus, the prior sex conviction by definition need not have a federal nexus, and Davison is simply

misreading the plain language of the statute.

>    2.    The Age of The Victim of the Prior Sex Conviction Need Not
>    Be An Element of the Offense.

The "prior sex conviction" must involve a minor victim for the mandatory

life sentence to apply.  In that regard, section 3559(e)(2)(D) provides: "the term

'minor' means an individual who has not attained the age of 17 years."  Because

the age of the victim is not an element of the crime of attempted rape in the first

degree under Maryland law, the Superseding Indictment contained a "Notice of

Special Findings" that included an allegation that the defendant "had a prior sex

conviction in which a minor was the victim" at the time of the charged offenses.

JA 56.  During the trial, Davison stipulated that he was convicted of the prior

Maryland offense, and that the victim in that offense had not attained the age of 17

years at the time of the offense.  SJA 1-2.

In his brief, Davison argues for the first time, without supporting authority,

that the mandatory life provision under § 3559(e) only applies to prior offenses

that have the age of the victim as an element of the offense.  Def. Br. 30.  This

contention lacks merit.  The plain language of the statute does not require the age

of the victim to be an element of the prior sex offense.  The mandatory minimum

sentence under § 3559(e) applies to prior sex convictions where the victim was a

-37-

minor, regardless of whether or not the age of the victim was an element of the prior offense. *See United States v. Doss*, 630 F.3d 1181 (9th Cir. 2011) (Congress intended a sentencing court applying § 3559(e) to look to the specific circumstances of a prior conviction to determine whether it involved a minor).

In this case, the finder of fact found beyond a reasonable doubt that Davison had a prior sex conviction in which a minor was the victim. JA 1194.

      3.    <u>The Statute Unambiguously Applies to Davison's Conviction</u>
              <u>Regardless of His Age or the Age Difference Between the</u>
              <u>Defendant and the Victim of the Prior Offense.</u>

At the time of Davison's attempted rape of MM in 1999, he was 16 years, two months and 23 days old. JA 1344, 1354, SJA 111. Davison was charged and convicted as adult under Maryland law. JA 1354, SJA 1-2. Davison argues, again without supporting authority, that his adult conviction for attempted first degree rape of a 15-year-old is not a qualifying conviction because *he* was a minor at the time of the offense, or alternatively, because he was *too close in age* to the minor victim at the time of the offense. Def. Br. 30-32. These claims also lack merit.

"When called to interpret federal statutes, [c]ourts indulge a strong presumption that Congress expresses its intent through the language it chooses. Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress

-38-

has drafted it." *United States v. Roper*, 462 F.3d 336, 338 (4th. Cir 2006) (internal quotation marks and citation omitted). The text of section 3559(e) unambiguously applies the mandatory life sentence to a defendant who previously committed a state sex offense in which a minor was a victim, regardless of the offender's age or the age difference between the offender and the victim.

This conclusion is buttressed by similar language in the Armed Career Criminal Act ("ACCA"). This Court has held that adult convictions of juveniles under state law qualify as predicate convictions under the ACCA. *See United States v. Lender*, 985 F.2d 151 (4th Cir. 1993). In *Lender*, the Court found that the statutory definition of a "violent felony" as a "crime punishable by imprisonment for a term exceeding one year" included Lender's conviction at age 17 because the definition of a crime punishable by more than one year of imprisonment "shall be determined in accordance with the laws of the jurisdiction in which the proceedings were held." *Id*. at 156. "Thus, if the state prosecutes an individual as an adult ..., the first part of the 'violent felony' definition applies." *Id*. The Court noted that if Congress had intended to set a uniform age for distinguishing between adults and juveniles under the ACCA, it could have done so, but it did not. Instead, Congress chose to defer to the states on this point, explicitly stating that what constitutes a conviction of a "crime punishable by imprisonment for a

-39-

term exceeding one year" is to be determined by the state law of the prosecuting jurisdiction. *Id*.

Sentencing under § 3559(e) parallels the use of predicate offenses for sentencing under the ACCA. Similar to the ACCA, which refers to "any crime punishable by imprisonment for a term of exceeding one year," § 3559(e) uses the phrase "an offense under State law that is punishable by more than one year in prison." Thus, just as in the ACCA, Congress in enacting § 3559(e) chose to defer to state law for the criteria constituting a qualifying offense. Just as Congress could have chosen to exclude defendants who were minors at the time of the offense from coverage under the ACCA, Congress could have excluded adult convictions by minors from the sentencing enhancements when drafting § 3559(e), but chose not to do so. The language of section 3559(e) plainly defers to state judgment to determine if an offender should be subject to a juvenile adjudication or a criminal conviction. When the state court finds a defendant guilty of a criminal offense, section 3559(e) does not contemplate any substantive difference between a defendant who is at least 18 years old and a defendant who is himself a minor but was charged as an adult.

Here, the State charged, convicted, and sentenced Davison as an adult for a violent sex offense that he committed when he was over 16 years old. Thus, under

-40-

section 3559(e), upon conviction of any one of the charges in the Superseding

Indictment brought under 18 U.S.C. § 2251, the district court was required to

sentence Davison to life imprisonment.[9]

Contrary to Davison's contention, the rule of lenity has no application to

this case. The rule of lenity only applies if, after considering text, structure,

history, and purpose, there remains a "grievous ambiguity or uncertainty in the

statute, such that the Court must simply guess as to what Congress intended."

*Barber v. Thomas*, 130 S. Ct. 2499, 2508-09 (2010). In this case, there is no

"grievous ambiguity or uncertainty" in the statutory provision before the Court,

and this Court need not "guess" what the statute means. The statute means just

what it says. Davison previously committed a prior sex offense where the victim

---

[9]    If it were necessary to resort to the legislative history, it would provide
further support for the view that section 3559(e) is meant to cover someone with
the defendant's criminal history, regardless of his age or the age difference
between him and his victim in the predicate offense. *See* H.R. Rep. 107-373, at 3
("Children have the right to grow up protected from sexual predators and free from
abuse. H. R. 2146 [18 U.S.C. § 3559(e) ] will protect America's children by
permanently removing the worst offenders from our society–those who repeatedly
victimize children."). This language shows that Congress's focus was on
protecting children from victimization by repeat offenders. Such a focus makes no
distinction between adult and youthful offenders. Davison's criminal history as
well as his conduct in the instant case establish that he is an offender who has
repeatedly victimized children. Having been released from serving a sentence for
a conviction for the violent attempted rape of a 15-year old girl just  prior to
abusing and filming his molestation of CW, an 11 year-old girl, Davison is
*precisely* the offender that Congress had in mind in enacting section 3559(e).

was a minor; thus, the sentencing enhancement applies.

## III.  SUFFICIENT EVIDENCE SUPPORTED THE CONVICTIONS.

### A.    Standard of Review

A defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden.  *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997).  In reviewing the sufficiency of the evidence supporting a conviction, this Court will consider *de novo* whether there is substantial evidence, taking the view most favorable to the Government, to support the guilty verdict. *Id*.  "In the context of a criminal action, substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  *United States v. Wilkinson*, 137 F.3d 214, 220 (4th Cir. 1998) (citation omitted).  The trier of fact, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented.  *Beidler*, 110 F.3d at 1067.  "Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear."  *Id*. (citing *Burks v. United States*, 437 U.S. 1, 27 (1978)).

### B.    The Convictions on Counts One Through Five and Seven

As recited in detail in the Statement of Facts above, the government introduced overwhelming evidence of Davison's guilt.  Due to space constraints,

-42-

we will not repeat all of that evidence here. With respect to the convictions on

Counts One through Five and Seven, it suffices to provide a brief summary of the

evidence.

### 1.    The Conspiracy Count (Count One)

In order to establish that Davison and his co-defendant conspired to produce

visual depictions of minors engaged in sexual acts, the government had to prove,

among other things, that they agreed to produce such visual depictions. *United*

*States v. Meredith,* 824 F.2d 1418, 1428 (4th Cir. 1987). However, the

government does not have to show an explicit agreement because "agreement may

be inferred from the facts and circumstances of the case," *United States v. Baker,*

985 F.2d 1248, 1255 (4th Cir. 1993), and "a tacit or mutual understanding among

or between the parties will suffice." *United States v. Depew,* 932 F.2d 324, 326

(4th Cir. 1991).

There was ample evidence from which the district court concluded that

Davison and Bolner agreed to produce the visual depictions at issue. They

repeatedly plied CW with alcohol, brought CW into their bed, and performed

sexual acts involving CW. Davison regularly took photographs and videos of that

sexual conduct, and he encouraged CW to do the same. Davison frequently took

nude pictures of CW, JA 871-72, and CW observed Davison store the images on

"cards" that he kept in "little clear cases" that he did not allow anyone else access, JA 873-74. Both Davison and Bolner showed CW a video of CW performing oral sex on Bolner. JA 866.

Bolner testified that from the very first time she and Davison molested CW, she came to expect that pictures and/or videos would be taken of sexual acts. JA 647. Her testimony on this point is corroborated by CW's testimony, the videos and images themselves, the letters Bolner received from Davison, and Davison's own testimony. Davison himself testified that he took, or might have taken, a number of the images of Bolner and CW engaged in sexually explicit conduct, although he conveniently denied taking those that formed the bases of the counts charged in the indictment.

Additionally, the images and videos themselves demonstrate that Davison and Bolner were engaging in the conduct together, and were both aware that the videos and images were being produced. For example, on the first video, which was the basis for Count Two, CW stated that she was "making an hour long video," and Davison and Bolner both responded to her comment. SJA 142, 149. As the trial court found, from at least this point forward, both Davison and Bolner were aware of the producing of images, and it was a common purpose of Davison and Bolner. JA 1198. Further evidence of the conspiracy between Davison and

-44-

Bolner is the lie they agreed to tell CW's family to convince her family to allow

CW to spend time at the Defendant's residences; that is, that Davison had a 10

year-old daughter who lived with him.  JA 586, 588, 591, 625-626, 855-56, 978-

79.[10]

Finally, given the number of pictures and videos of Davison, CW, and

Bolner, as well as the content of those pictures and videos, a rational trier of fact

could find beyond a reasonable doubt that Davison and Bolner had, at a minimum,

---

[10]    Davison argues that the conspiracy was over by the time he told this lie to
CW's mother (after he had moved next door to CW in April 2010), but there was
significant evidence from which the district court could conclude that the
conspiracy to produce child pornography continued into April and May of 2010.
For example, Bolner testified that the sexual abuse of CW continued after she and
Davison moved into the apartment on 8th Street.  JA 662.  Indeed, Davison
testified that the sexual abuse of CW happened "[a]lmost every single time" CW
"came over," corroborating Bolner's testimony on this point.  JA 921.  In addition,
CW testified that while in the 8th Street apartment, Davison and Bolner showed
her a video of her performing a sex act on Bolner.  JA 866.  Moreover, images
admitted into evidence prove that depictions of sexually explicit conduct were still
being produced as late as April 29, 2010.  Government's Exhibits 40-27, 40-31,
and 40-32 are images from the 64MB SD card that include an image that focuses
on CW's vagina taken on April 29, 2010, at the 8th Street apartment.  JA 540; SJA
173-78.  In any event, Davison misconstrues the significance of the ruse regarding
his fictitious daughter and the purpose for which the court relied on it.  It is
immaterial whether Davison created this deception, or participated in telling the
lie in the beginning.  The significant point is that Davison *knew of the deception,
and that he agreed to it*.  *See* JA 979 ("I agreed to it ..."); *see also* JA 1197 (district
court's finding that "the two defendants ... *agreed* together to conspire to mislead
the young lady's mother as to what was going on by lying so they could have
access to the young lady") (emphasis added).

-45-

a tacit or mutual understanding that they would sexually abuse the victim for the

purpose of making recordings of the sexual acts.

### 2. The Production Convictions (Counts Two Through Five)

Davison likewise errs in challenging the sufficiency of evidence that he

produced child pornography, as alleged in Counts Two through Five, in violation

of 18 U.S.C. § 2251(a). The elements of production of child pornography are:

1. The victim was under the age of 18;
2. The defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and
3. The visual depiction was produced using materials that had been transported in interstate or foreign commerce.

*United States v. Malloy*, 568 F.3d 166, 169 (4th Cir. 2009).

Davison does not contest the sufficiency of the proof on the first and third

elements: CW was 11 years old at all relevant times, and the cell phones and SD

cards used were made in foreign countries. He does, however, argue that the

government's proof with respect to the second element of the crime was

insufficient to sustain his conviction on Counts Two through Five. This argument

ignores the compelling evidence the government introduced with respect to these

counts.

With respect to Counts Two and Three, CW held the video camera during

-46-

the filming of those videos.  However, as the district court found, Davison was

clearly aware of the camera, as evidenced by his smiling for the camera and his

statements.  JA 1198.  As to both videos, it is more than reasonable for the fact

finder to draw an inference that an 11 year-old who had never previously engaged

in such sexual conduct, did not come up with the idea to record sexual conduct

wholly on her own, especially given Davison's acknowledged sexual interest in

children, his active participation in the videos, his admission that he sexually

abused CW on multiple occasions and plied her with alcohol.   Furthermore, the

defendant was clearly aware of the recordings based on his conduct during the

videos and his proximity to CW and the camera.  Viewing the evidence in the light

most favorable to the government and drawing all reasonable inferences in its

favor, the fact finder could easily find that one of Davison's purposes of

persuading, inducing, and enticing CW to engage in sexually explicit conduct was

to produce the videos in Counts Two and Three.[11]

---

[11]   Davison's argument as to Counts Two and Three appears to be that because
he did not hold the video camera, the government failed to provide sufficient
evidence from which a rational trier of fact could find him guilty of production of
those two videos.  This contention is meritless.  *See, e.g., United States v. Starr*,
533 F.3d 985, 998 (8th Cir. 2008) (rejecting argument for motion for judgment of
acquittal based on claim that victims acted voluntarily in taking sexually explicit
pictures and sending them to the defendant where the defendant introduced the
sexual dimension to the relationship and provided the camera to take pictures).
Further, Davison's reliance on  *United States v. Broxmeyer*, 616 F.3d 120 (2d Cir.

-47-

The evidence that supports Davison's convictions for Counts Two and Three also adds to the inference that Davison produced the video and image that make up Counts Four and Five. Additionally, despite Davison's argument to the contrary, the video and image charged in Counts Four and Five alone prove that Davison produced these files.[12] The video charged in Count Four shows a nude CW, sitting cross-legged across Davison's legs, masturbating Davison's penis with her hands. The video is taken from the direction of Davison's upper torso. Count Five is based on a photograph – taken approximately four minutes after the video charged in Count Four – of CW performing fellatio on Davison, and the photograph is also taken from the area of Davison's upper torso. Both the video and the image, when viewed alone, allow a reasonable fact finder to conclude that

---

2010), is misplaced. The defendant in *Broxmeyer* did not appear in the sexually explicit pictures, and there was no evidence in the record that the defendant in any way encouraged the victim to take the pictures because there was no evidence of when the pictures were taken. The pictures could have been taken before the victim even met the defendant. In sharp contrast to *Broxmeyer*, Davison appeared in the videos that form the basis of Counts Two and Three, he actively encouraged CW to engage in the sexually explicit conduct on those videos, and the videos themselves provide evidence that he knew the videos were being produced and that he encouraged their production.

[12]    Nevertheless, contrary to Davison's assertion, the decision of guilt on Counts Four and Five did not hinge on a finding that he was the photographer. As the court found, because this video and image were taken as part of the conspiracy, Davison's guilt was also established through conspiracy liability. JA 1199-1200.

Davison was the photographer.

In his testimony, Davison denied producing these images, or even knowing that they were produced. He claimed that Bolner produced the images and video while she was sitting across his chest and while CW was performing the sex acts on him. JA 1015. The district court rejected Davison's testimony on this point: "The suggestion that Miss Bolner took [the images] while lying across his chest holding out a camera in some performance of agility and plasticity that would be equivalent for a cartoon character is just not believable." JA 1199. The district court was entitled to base its finding of guilt, in part, on Davison's incredible testimony. *See United States v. Burgos*, 94 F.3d 849, 867-69 (4th Cir. 1996) ("Relating implausible, conflicting tales to the [trier of fact] can be rationally viewed as further circumstantial evidence indicating guilt.").[13]

Finally, although Davison denied producing the images that formed the basis of the counts in the indictment, he admitted on cross-examination that he "might have" taken the photograph depicted in Government's Exhibit 40-24,

---

[13]    In addition, CW specifically testified about Davison's role as photographer and his knowledge of the depictions. *See* JA 873 (CW relating that Davison told her the nude images of CW "turned him on"). This is an admission of production of child pornography (and possession) that Davison has never addressed, and that a rational finder of fact could reasonably rely on in convicting him. Additionally, Davison's letters to his sister and to Bolner clearly show his detailed knowledge of the content of the videos and images.

which depicts CW engaged in sexually explicit conduct.  JA 987-88; SJA 170.  It was clear from Davison's testimony that he created a defense that he thought would allow him to escape conviction, and that he attempted to mold his testimony to fit the facts.  In admitting to possibly taking other images of CW engaging in sexually explicit conduct with him and Bolner, Davison unwittingly confirmed what was already obvious: that he was responsible for the production of all of the images, charged and uncharged.

In short, the district court's factual finding that Davison personally created the images charged in Counts Four and Five was supported by substantial evidence and should not be disturbed.

### 3.    The Child Pornography Conviction (Count Seven)

Davison also misses the mark in challenging the sufficiency of evidence that he possessed child pornography, as charged in Count Seven, in violation of 18 U.S.C. § 2252A(a)(5)(B).  The elements of possession of child pornography are:

1.   The defendant knowingly possessed a visual depiction;
2.   The visual depiction was produced using materials that had been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including computer;
3.   The visual depiction was child pornography; and
4.   The defendant knew of the sexually explicit nature of the material and that the visual depictions were of an actual minor engaged in that sexually explicit conduct.

-50-

18 U.S.C. § 2252A(a)(5)(B); *Sand, et al.*, Modern Federal Jury Instructions, No. 62-26.

This case overflowed with evidence of Davison's knowing possession of the images found on the SD cards. First, the images that Davison produced were possessed by him at the time of the production. Davison also possessed all of the images found on the cards, whether he took them or not. The court heard evidence that Davison discussed his production of images with CW, JA 874, that he did not let others access the cards containing the child pornography, JA 873-74, that he and Bolner showed a video to CW, JA 866, and that he wrote letters to his sister and Bolner in which he discussed the content of the images and how to locate the files on the devices. *See, e.g.,* JA 321, 322-324, 676-77, 1209. In short, the government introduced overwhelming evidence that Davison knowingly possessed the sexually explicit images of CW.

### C.    The Conviction on Count Eight

Davison argues that, under *Fowler v. United States*, 131 S. Ct. 2045 (2011), the government's proof with respect to Count Eight was insufficient.[14] He is

---

[14]    At trial, Davison did not object to the "Government's Statement of the Elements," which the trial court used as the "legal basis on which the fact finder has proceeded." JA 1193-94; SJA 5-29. In the statement of elements for Count Eight, the formulation of the official proceeding element was that "[i]t was foreseeable to the defendant that his actions would naturally and probably interfere

-51-

incorrect.

Count Eight charged Davison with tampering with objects and proceedings, in violation of 18 U.S.C. § 1512(c), which provides: "Whoever corruptly (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both."

In *Fowler*, the Supreme Court construed a different subsection of section – 18 U.S.C. § 1512(a)(1)(C)[15] – under circumstances "where a defendant killed a person with an intent to prevent that person from communicating with law enforcement officers in general but where the defendant did not have federal law enforcement officers (or any specific individuals) particularly in mind."  131 S. Ct. at 2048.  In such a case, the Court held, the defendant acts with the requisite

_____

with an official proceeding."  SJA 23.  The Supreme Court decided *Fowler* 14 days after the district court issued its verdict.  Davison made a sufficiency-of-the-evidence claim based on *Fowler* in a post-trial motion for judgment of acquittal. SJA 35-39.

[15]    Section 1512(a)(1)(C) makes it a crime to kill or attempt to kill another person "with intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission of a Federal offense."

-52-

"intent to prevent communications with federal law enforcement officers only if it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications would have been made to a federal officer." *Id*. at 2052. The Court emphasized that "[t]he Government need not show that such a communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that it is more likely than not." *Id*.; *see also id*. at 2050 ("The Government will already have shown beyond a reasonable doubt that the defendant possessed the relevant broad indefinite intent, namely, intent to prevent the victim from communicating with (unspecified) law enforcement officers."). The government, however, "must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id*. at 2052.

Sections 1512(a)(1)(C) and 1512(c) differ in at least two important respects. First, section 1512(a)(1)(C) deals with killing someone to "prevent" a communication to federal law enforcement officers. The word "prevent" is critical because the Supreme Court's "reasonable likelihood" standard developed in *Fowler* stems from a definition of the word "prevent": "to render (an *intended*, *possible*, or *likely* action or event) impractical or impossible by anticipatory action." *Id.* at 2051. The Court applied the word "likely" from this definition to

come up with its "reasonable likelihood" standard. *Id*. at 2052.

Second, unlike the subsection of section 1512 at issue in this case, the subsection interpreted by *Fowler* does not reference an "official proceeding" at all. *Fowler* therefore provides no guidance on whether an official proceeding must be instituted before the destruction, or whether a defendant must intend to disrupt a federal proceeding as opposed to a state proceeding, or what degree of probability there must be that an official federal proceeding will happen in the future if it is not already underway. This Court should decline to extend *Fowler*'s reasonable likelihood test for section 1512(a)(1)(C) to the significantly different section 1512(c).

However, even assuming the rationale underlying the Supreme Court's analysis of sections 1512(a)(1)(C) and (g)(2) extends to sections 1512(c) and (g)(1), the government contends that just like a defendant need not have a federal law enforcement officer in mind to be convicted under section 1512(a)(1)(C), the defendant need not have a federal proceeding in mind when he attempts to destroy an object in order to be convicted under either subsection of section 1512(c). It is sufficient for the government to prove beyond a reasonable doubt that the defendant intended to destroy an object to prevent its use in any proceeding because section 1512(g)(1) provides that no state of mind is required as to whether

-54-

the "official proceeding" is before a federal entity.  In this case, the government
has met its burden of proving that Davison wanted to destroy the SD cards and
images on them to prevent their use at any proceeding against him.

Under *Fowler*, the question would be whether the government presented
evidence of a sufficient federal nexus between the attempted destruction of
evidence and the "official proceeding."  The government easily met that burden,
assuming *arguendo* that the government needed to do so.  Key images and videos
used against Davison in the federal case against him were on the very SD cards he
tried to destroy.  In this case, the Court need not speculate about whether or not
the evidence *would have* been used in a federal proceeding, because the evidence
*was* used in such a proceeding.  The statute clearly provides that the proceeding
need not have been "pending or about to be instituted at the time of the offense."
18 U.S.C. § 1512(f)(1).

Moreover, Baltimore City Detective George Jones testified that he had been
assigned to the Child Abuse Unit since 1996, and that he investigates cases
relating to child sex abuse and serious cases of physical child abuse.  JA 312.
Detective Jones testified that he began investigating Davison's abuse of CW on
May 23, 2010, JA 313, that the search warrants were executed and the 2GB SD
card was seized on June 17, 2010, JA 325, and that he submitted the 2GB SD card

-55-

and other electronic evidence for forensic examination.  JA 329.  Detective Jones

further testified that in September 2009 he began assisting FBI Special Agent

Corn in her investigation into Davison and Bolner.  JA 334.  Similarly, Agent

Corn testified that she is assigned to the Baltimore Division of the FBI, to the

Child Exploitation Task Force, and that she investigates federal violations of child

exploitation.  JA 487.  Agent Corn further testified that the federal investigation

into Davison began in September of 2010, while the defendant was pending trial

in state court in Baltimore City.  JA 488.  As part of her investigation, Agent Corn

and Detective Jones visited Davison's and Bolner's apartment in an attempt to

locate where the two videos found during the forensic examination were filmed.

JA 492.  From this evidence, a rational trier of fact could reasonably infer that the

Baltimore City Police Department brought in the federal authorities following the

discovery of the images and videos on the 2 GB SD card.  It follows that, even

under a *Fowler* reasonable likelihood standard, the conviction of Davison for

obstruction of justice as charged in Count Eight should stand.[16]

---

[16]    Furthermore, in the context of the non-jury trial that occurred in this case,
even if the evidence offered at the trial was insufficient to convict Davison on
Count Eight – which it was not – any such error was harmless.  Prior to the
hearing on Davison's motion for judgment of acquittal, the government requested
to reopen its case-in-chief in order to present additional evidence relating to the
referral mechanisms of child pornography cases between the FBI and local law
enforcement agencies, including the Baltimore City Police Department.  SJA 56-

## CONCLUSION

For the reasons stated, this Court should affirm the defendant's convictions and sentence.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


_____/s/_____
Paul E. Budlow
Kristi O'Malley
Assistant United States Attorneys
Lindsey Carpenter, Law Clerk

April 2, 2012

---

58.  The government would have conclusively established that cases involving sexual abuse and the production of child pornography are routinely referred from Baltimore City law enforcement to federal law enforcement, and that this case was referred in that normal course.  The defense did not dispute these factual assertions.  The district court recognized, therefore, that "to send [this case] back for a retrial would be a meaningless act."  JA 1248H.

-57-

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument is not necessary in this case.

## CERTIFICATE OF COMPLIANCE

1.     This brief has been prepared using **WordPerfect, Times New Roman, 14 Point**.

2.     EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains **13,914** words; I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

_____/s/_____
Paul E. Budlow
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 2, 2012, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send

notice of such filing to the following registered CM/ECF user:

Edward C. Sussman
Law Office of Office of Edward Sussman
601 Pennsylvania Avenue, NW
South Building, Suite 900
Washington, DC 20004


_____/s/_____
Paul E. Budlow
Assistant United States Attorney